CATHOLIC DIOCESE OF KANSAS CITY–ST. JOSEPH, Respondent,

v.

LABOR AND INDUSTRIAL RELATIONS COMMISSION, and the Division of Employment Security, Appellant.

No. WD 31780.

Missouri Court of Appeals, Western District.

March 30, 1981.

Per Curiam On Motion for Rehearing and/or Transfer to Supreme Court Denied June 30, 1981.

Rick V. Morris, Jefferson City, for appellant.

Thomas Sullivan, Edward L. Fitzgerald, Robert S. Thedinger, Downey, Sullivan & Fitzgerald, Kansas City, for respondent.

Before PRITCHARD, P. J., and TURNAGE and CLARK, JJ.

TURNAGE, Judge.

A deputy in the Division of Employment Security of the Labor and Industrial Relations Commission determined administratively that the Catholic Diocese of Kansas City-St. Joseph became an employer subject to the payment of employment security taxes under Chapter 288, RSMo 1978. On ap-

peal an appeals tribunal of the Division affirmed that finding. A further appeal to the Labor and Industrial Relations Commission again resulted in affirmance of the deputy's determination. On appeal to the circuit court the Commission's decision was reversed and the Commission has appealed.

The question presented is whether or not lay teachers in elementary and secondary schools operated by the Diocese are in the employ of a church, convention, or association of churches, or an organization which is operated primarily for religious purposes under § 288.034.9(1). Affirmed.

The action of the Division in seeking to bring lay school teachers employed by the Diocese within the coverage of the Employment Security Act arose after Congress, in 1976, deleted the exemption in the Federal Unemployment Tax Act[1] for employees of elementary and secondary schools. Following this action by Congress, the Secretary of Labor made the administrative decision that services performed in all elementary and secondary schools, including church schools, would be covered by the Unemployment Tax Act and the states were required to conform their laws to that interpretation to be eligible to receive federal funds. Following this interpretation and mandate from the Secretary of Labor, the Missouri Division took the position that at least all lay employees of parochial elementary and secondary schools were covered by § 288.034 which has been passed to conform to the federal administrative position.

There is no dispute that both 26 U.S.C. § 3309(b)(1) and § 288.034.9(1) in identical terms exempt from unemployment coverage those:

In the employ of a church or convention or association of churches, or an organization which is operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches; . . . .

The appeals tribunal of the Division conducted a hearing at which the only evidence was presented by Monsignor Koenig and Joseph B. Connor on behalf of the Diocese. Monsignor Koenig is the Vicar General of the Diocese, which means that he acts for the Bishop in most matters when the Bishop is without the Diocese. Monsignor Koenig explained that the Catholic Church is divided into geographical territories which are called dioceses and a Bishop is appointed by the Pope as the head of each diocese. The Kansas City-St. Joseph Diocese contains twenty-seven counties in Northwest Missouri. The diocese in turn contains a number of parishes, or churches, serving specific areas. Monsignor Koenig was asked to consider the definition of "church" as given in Webster's New Third International Dictionary (1971) and in particular No. 4 thereof. Under No. 4, the dictionary defines a church as "a: the organization of Christianity or of an association of Christians; c: a body of Christian believers holding the same creed, observing the same rites, and acknowledging the same ecclesiastical authority regarded either as the only true representative of or as a separate branch of the church universal and often confined to territorial or historical limits." Monsignor Koenig stated that he agreed with the dictionary definition. The Monsignor stated that the Diocese is a church in itself "because it's made up of—of these various units which in turn are churches. It's a grouping of churches and as such it would be the—the supervising entity of these units." The Monsignor stated the first purpose of the Diocese is liturgical, i. e., to provide the opportunity for the people to worship God through the offering of mass, the administration of the sacraments, caring for the sick, preparing them for death, marrying people, baptizing people and burying people. It has a concern for the poor and has established means for carrying out this concern. Many parishes operate schools under the supervision of the Diocese for the total education of the children.

1. 26 U.S.C. § 3301 et seq.

The Monsignor said there are 40 elementary schools, 6 high schools and 90 churches in the Diocese which are all owned by the Diocese. From the testimony of both Monsignor Koenig and Mr. Connor, it appears that the Diocese has a form contract which has been used for about 10 years and which is required to be signed by each person hired to teach in any of the Diocese schools. The agreement is between the Diocese and the teacher. The Diocese screens all applicants for teaching positions in the schools and maintains a list of those who have been approved. Day to day supervision of the schools and at least some hiring is done by local school boards or parish education committees, but no one may be hired who is not on the Diocese approved list. There are about 850 teachers in the Diocese, of whom about 150 to 200 are members of religious orders, leaving approximately 650 lay teachers. The teacher contracts provide that the contract may be terminated by the Diocese for cause.

There is a Diocesan school board with a superintendent of schools who has the overall supervision of all Diocese schools. The schools are financed by assessments levied on each parish and tuition paid by the students. The Diocese oversees the expenditure of money, at least for the major expenses, of each school through the writing of checks for these expenses. There was no evidence that any of the schools owned and operated by the Diocese had any separate legal existence.

Monsignor Koenig said that the Kansas City-St. Joseph Diocese was incorporated by pro forma decree in the circuit court of Jackson County, Missouri, as the Catholic Diocese of Kansas City, Inc., in 1947, and that decree was amended to change the name to Catholic Diocese of Kansas City-St. Joseph in 1956. The Bishop is the president of the corporation and also the spiritual head of the Diocese.

The Commission made findings of fact in which it found that the Diocese owns and operates approximately 46 schools and enters into a contract with each of the approximately 650–700 lay teachers. The teaching of secular subjects takes up about 80 to 85% of the teacher's time and the remaining 15 to 20% is devoted to formal religious training. The Commission noted the legislative history of the changes made by Congress in the Unemployment Tax Law and stated that for the Diocese to obtain exemptions through the Missouri law it is required to show that it is a church, a convention or an association of churches or an organization operated primarily for religious purposes. The Commission found that the Diocese was first incorporated in 1947 for the purpose of conducting the temporal affairs of the Diocese, but that the ecclesiastical organization continued for the purpose of conducting spiritual affairs. The Commission then found that the legal corporation is not a church, a convention or an association of churches, or an organization operated primarily for religious purposes. The Commission reached this conclusion by noting that the Catholic Church had a presence in Kansas City and Northwest Missouri for many years before the corporation was formed. The Commission found that since the Diocese schools employed between 76 and 82% lay teachers and since 80 to 85% of the school time is spent on secular as opposed to religious education the schools were primarily operated for educational purposes.

The review made by this court of the decision of the Commission "is limited to ascertaining upon the whole record whether the Commission could have reasonably made its findings and reached its result considering the evidence most favorable to the award." *Citizens Bank of Shelbyville v. Industrial Com'n*, 428 S.W.2d 895, 897[4–6] (Mo.App. 1968).

The administrative decision made by the Secretary of Labor was overturned in *State of Alabama v. Marshall*, 626 F.2d 366 (5th Cir. 1980). In that case the court considered the objections raised by the states of Alabama and Nevada to the Secretary's

decision that sectarian elementary and secondary school teachers were subject to the unemployment tax. The states contended those teachers were exempt under 26 U.S.C., § 3309(b)(1) because those employees are in the employ of a church. The states presented evidence before an administrative law judge showing that many of the church schools have no separate legal existence from their church; the school employees are hired, controlled, disciplined and fired by church representatives and officials; school buildings are owned by the church; and school employees are paid with funds drawn from the church accounts. The states further pointed out that many cases recognize that services performed by parochial schools are an integral part of the religious mission of the governing church.

The court held that it must interpret the statute according to its plain language unless a contrary intention is clearly shown. The court held at p. 369:

> The statute plainly indicates that the exemption is contingent upon who the employer is and is not contingent upon the type of services the employee is performing. There is no question here that the persons performing services in these religious schools fall within the "in the employ of" language of the statute, therefore, if the employees involved are employed by a "church", the exemption applies to them. Resolution of this question depends upon what is meant by "church" as used in the statute. We are convinced that the plain meaning of "church" requires a definition as something qualitatively greater than the physical building of worship and, at a minimum, the term encompasses the legal entity commonly referred to as a church.

■ This court agrees with the reasoning in *Marshall* and its holding. *Marshall* conclusively answers the argument made by the Commission that the amendments adopted by Congress compels a finding that the lay teachers employed by the Diocese are covered by Chapter 288. *Marshall* also disposes of the argument made by the Commission that the teachers involved herein are covered because 80 to 85% of the school time is spent on secular topics. As pointed out in *Marshall* the decisive question is the identity of the employer and not the nature of the duties performed by the employee. The exemption provided in § 288.034.9(1) covers all persons in the employ of a church. It makes no requirement concerning their duties. Thus, the findings of the Commission concerning the amount of time spent by the teachers on secular and religious topics is completely irrelevant.

■ The court in *Marshall* found the employer to be a church. It will be noted that about all of the facts relative to the church schools in *Marshall* are present in this case. The question of whether or not the Diocese is a church or an association of churches remains to be examined in this case in the light most favorable to the Commission's decision. The only evidence before the Commission was the testimony of Monsignor Koenig and Mr. Connor. Monsignor Koenig testified that the Diocese is a church and is also an association of churches. The Commission did not have any other evidence upon which it could base a finding on the question of whether or not the Diocese was a church or an association of churches. The Commission may not arbitrarily disregard or ignore undisputed testimony of a witness who is not shown to have been impeached or disbelieved. *Missouri Church of Scientology v. State Tax Comm.,* 560 S.W.2d 837, 843[7, 8] (Mo.banc 1977).

Here the Commission made no finding that it disbelieved Monsignor Koenig, thus, the uncontradicted evidence before the Commission was that the Diocese is a church and an association of churches.

The Commission sought to avoid the conclusion that under the evidence it was required to find the Diocese to be a church or an association of churches by attempting to split the church into two distinct legal entities. The Commission found that the Dio-

cese had incorporated for the purpose of handling its temporal affairs but that the ecclesiastical organization of the Diocese long predated the corporation, and, thus, the Diocese does not exist as a single entity but, in fact, possesses two identities—one the temporal corporation and the other the spiritual ecclesiastical organization which has existed since the beginnings of the Catholic Church. The Commission found the corporation or the temporal entity of the Diocese is not a church. Although the Commission did not spell out any reason or basis for this finding, it apparently was pursuing the theory that the legislature had used the word "church" in § 288.034.9(1) to refer only to the ecclesiastical or spiritual identity of the church.

Under this definition only those persons performing strictly ecclesiastical duties would be exempt. Yet, as pointed out above, the legislature did not impose any conditions upon the nature of the duties an employee may perform—the only test is the nature of the employer. Had the legislature intended to exempt only those employees performing strictly religious duties it could very easily have done so.

It is well known that churches employ persons to perform duties that are not directly related to a religious ceremony or function. Actually, the hiring of employees would seem to be more in the temporal realm. Further, it is well known and the legislature was fully aware that many churches operate schools. Again, if any inquiry was to be required to determine the exemption other than the nature of the employer, this could have been easily spelled out.

■ Left unanswered under the Commission's reasoning is the status of those church bodies which have not incorporated, i. e., whether or not the Commission would hold that they also possess two separate and distinct identities, one temporal and one spiritual. However that may be, this court

2. See 55 N.Y.U. Law Review, 242, 253 (1981).

must take the language employed by the legislature in its plain, ordinary meaning and in that context there is no reason to believe the legislature used the word "church" in a very narrow or technical sense. The legislature, rather, wisely refrained from defining the word "church." Without a statutory definition of "church" the Commission should have made a finding of whether or not the Diocese came within the exemption based on the evidence rather than attempting that which the legislature avoided—formulating a definition of "church." In this case the only evidence before the Commission consists of the description by Monsignor Koenig that the nature and composition of the Diocese is a church and an association of churches as that word is defined in Webster's Third New International Dictionary. Monsignor Koenig was admittedly qualified to detail the nature, function and organization of the Diocese and to give his opinion that it constitutes a church and an association of churches as the word "church" is commonly understood.

The evidence in this case as to the control exercised by the Diocese over the schools closely parallels that in *Marshall.* Here the schools do not have a separate legal entity from the Diocese, but are owned and controlled by it.[2] Under any view of the evidence in this case it must be held the Diocese demonstrated the only relevant fact to show its entitlement to be exempt—that it is a church and an association of churches.

This court rejects the effort of the Commission to indulge in linguistic gymnastics in order to defeat the intention of the legislature as expressed in its plain language granting immunity to those in the employ of a church or an association of churches. This court is again in agreement with *Marshall* in that conclusion.

Absent any evidence in the record to show that the Diocese is not a church or an association of churches, it may not be said

that the Commission could have reasonably made its findings and reached the result it did. The judgment of the circuit court in reversing the finding of the Commission is affirmed.

All concur.

## ON MOTION FOR REHEARING OR TRANSFER TO THE SUPREME COURT

PER CURIAM.

The Commission has filed a motion for rehearing or to transfer to the Supreme Court on the ground that *Marshall* is not final because it is pending on application for certiorari in the United States Supreme Court. That application was denied on June 1, 1981. 49 L.W. 3893.

On May 26, 1981, the United States Supreme Court decided *St. Martin Evangelical Lutheran Church and Northwestern Lutheran Academy v. State of South Dakota,* —— U.S. ——, 101 S.Ct. 2142, 68 L.Ed.2d 612 (1981). In that case the court held the word "church" in the statute means more than the building used for worship when it stated: "The word 'church' in § 3309(b) must be construed, instead, to refer to the congregation or the hierarchy itself, that is, the church authorities who conduct the business of hiring, discharging, and directing church employees." In this case the Diocese constituted the church authorities who were responsible for hiring the teachers.

The court further observed that the schools involved in that case did not have any separate legal identity from the church which controlled them. That fact is pointed out in this case in the opinion.

The court in *St. Martin* categorically rejected the reasoning of the Secretary of Labor and held that school teacher employees of churches are exempt under § 3309(b)(1) from contributions for unemployment compensation. In fact, the court in *St. Martin* utilized much the same reasoning as did this court in arriving at the same result.

With the decision in *St. Martin* there is now no doubt that the view of the Secretary of Labor, and imposed by him upon the states, is erroneous and should not be followed.

The motion for rehearing is overruled and the motion to transfer is denied.