**ST. LOUIS CHRISTIAN HOME, a Missouri Not-for-Profit Corporation, Respondent,**

v.

**The MISSOURI COMMISSION ON HUMAN RIGHTS, and Phillip J. Hoskins, Hearing Examiner, Appellant.**

**No. WD 32149.**

Missouri Court of Appeals, Western District.

April 6, 1982.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied June 1, 1982.

Application to Transfer Denied July 12, 1982.

criminated against him by discharge from that employment on account of his negro race. In due course, the agency investigated the complaint, found probable cause of discrimination, and set the cause for hearing after conciliation failed. The petition of the Home for writ of prohibition was granted by the circuit court, evidence was taken, and the preliminary rule was made absolute against the Commission exercise of jurisdiction on the complaint against the Home.

The provisions of the Discriminatory Employment Practices Act [Chapter 296] render unlawful the practice of an employer [§ 296.020.1(1)(a), RSMo Supp. 1979]:

> To fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, creed, religion, national origin, sex, ancestry, or handicap.

The term *employer* in the context of the enactment means [§ 296.010(2)]:

> "*Employer*" includes the state, or any political or civil subdivision thereof, or any person employing six or more persons within the state, and any person acting in the interest of any employer, directly, but *does not include corporations and associations owned and operated by religious or sectarian groups.* [emphasis added]

The act then confides to a human rights commission the power to investigate, conciliate and prosecute complaints of infractions by an *employer* and to enter appropriate orders after hearing. §§ 296.030, 296.040 and 296.050.

■ The appeal presents the question whether the not-for-profit corporation St. Louis Christian Home was an *employer* within the act, and so amenable to the jurisdiction of the Commission. In the context of the evidence, the more exact question is whether St. Louis Christian Home was *owned and operated by a religious group*, The National Benevolent Association of the Christian Church [NBA], and so excluded from the definition of *employer*. The stipulation between the Home and the

John D. Ashcroft, Atty. Gen., Scott A. Woodruff, Asst. Atty. Gen., Jefferson City, for appellant.

Thomas O. McCarthy, St. Louis, for respondent.

Before SHANGLER, P. J., and WASSERSTROM and CLARK, JJ.

SHANGLER, Presiding Judge.

The Missouri Commission on Human Rights appeals from the absolute rule in prohibition entered by the circuit court to enjoin the agency from exercise of jurisdiction over the St. Louis Christian Home, a not-for-profit corporation. The agency undertook to act on a complaint of one Hendrix that the St. Louis Christian Home dis-

Commission agrees that NBA is a *religious group* and the Commission brief on appeal concedes that NBA *owns* the Home—both within the sense of § 296.010(2)—but the Commission contention remains that the evidence does not prove that the Home was a corporation *operated* by NBA and so exempt from employer liability under the act. The evidence on that issue was not countervailed by the Commission, which offered no proof. Thus, our decision poses the question only whether the evidence allows the inference—drawn by the trier of fact—that NBA operated the Home.

The NBA is one of the twelve administrative units of that sect. NBA was organized in year 1887 by the women of the church from concern for orphans and destitute adults. It since organized as a pro forma corporation under Missouri law and operates under and reports to the General Assembly and General Board of the Christian Church as one of its component administrative units. The corporate purpose of NBA, as defined in its constitution, is to provide for material and spiritual wants and, to that end, to establish and maintain homes, hospitals and training schools. That mission is conducted through the operation of forty-two separate units, among them, the Home. These several units fall within one of three categories: those owned and operated by NBA, those financed federally and owned by a local corporation—but managed by NBA, and those owned by the local corporation but managed on a contractual basis by NBA. The Home—according to the president of the NBA—comes within the category of an owned and operated facility.

The evidence on the prohibition proceeding was that the Home was founded as an orphanage in year 1889 by the women of the Christian Church [Disciples of Christ] until year 1948 when the Home formally organized under the Religious and Benevolent Corporation law of Missouri by a pro forma decree of incorporation. The original designation of Christian Orphan's Home was changed to St. Louis Christian Home in year 1946 and so remains. In the 1960 decade, the function of the Home changed

from an orphanage to a residential treatment center, and in the 1970 decade, into an emergency treatment center for battered, abused and neglected children. In addition, the Home operates a school on the premises for children emotionally unsuited to attend the public schools. The Home facility is located on a tract of land in St. Louis owned by the National Benevolent Association of the Christian Church.

The Home was organized by pro forma decree in 1948. The Articles of Agreement filed with the petition for that purpose expressly acknowledged that "[t]his corporation shall at all times be a subsidiary of the National Benevolent Association of the Christian Church . . . and said National Benevolent Association shall exercise supervision, superior control over all the operations of this [the Home] corporation." The revised constitution of the Home reaffirms that status. That latter document recites also that "upon liquidation, dissolution or abandonment" the Home assets "must inure to the [NBA] or its successors." The chief administrative officer of the Home, the Executive Director, is subject to appointment and discharge by the chief administrative officer of NBA, the President, at a salary set and paid by NBA. The Executive Director of the Home then comes under the absolute supervision of the President of NBA and reports to that office. The membership of the Home corporation consists of communicants of the Christian Church. The Home is governed by a twenty-seven member Board of Directors, twenty-three of whom belong to the Christian Church sect. The tacit policy of the Home requires that a majority of the Board shall belong to the Christian Church. There is no requirement that the Executive Director, nor any member of the Board, nor any employee of the Home belong to the Christian Church sect. The NBA President, however, with consent of the NBA trustees may suspend or remove any Home Director. Each of the forty-two units under the administrative supervision of NBA, the Home included, may adopt articles of incorporation and by-laws, elect officers, and create commit-

tees—but all are subject to the prior approval of the NBA trustees.

There was evidence that NBA supervises the daily operation of the Home. The annual budget of the Home is approved by NBA. The Home funds are invested by NBA, which also determines policy and procedure for the disbursement of funds received by that unit from all sources. The nature and quality of the Home treatment programs are the responsibilty of the NBA department of care services. Any significant change in the Home program has prior approval of NBA. Admission standards are also subject to such approval. The NBA department of the treasury performs all accounting functions for the Home and provides for an annual independent audit. The NBA corporate secretary oversees the maintenance of the records of each unit and represents them before public regulatory bodies. The NBA communications officer guides the Home publications and public relations efforts. NBA is responsible for any capital improvement at the Home facility. The NBA division of development has responsibility to raise funds for the Home. NBA receives an allotment of the national church income for distribution among the units. The share allocated to the Home in 1980 was $51,000. The relationship between NBA and the Home is more intimate than with other units because both are within St. Louis.

The Home is exempt from federal income tax. Qualification for that exemption rests solely on the Home relationship with NBA. The Home is also exempt from state sales and use taxes by virtue of a religious and charitable status. The Home child care program is exempt from licensure by the Division of Family Services because operated by a "well-known religious order" within the definition of statute. Also, the Missouri Department of Elementary and Secondary Education rejected a Home application for a contract for educational services on the ground that the Home was "church affiliated" and so under the prohibition of Mo. Const. Art. IX, § 8 against such governmental agreements.

The circuit court accepted the Home evidence as true and entered compatible findings of fact and the conclusion of law that: "St. Louis Christian Home is owned and operated by a religious group, the NBA," and so was exempt from the liability of an *employer* under § 296.010(2) and the jurisdiction of the Missouri Commission on Human Rights under the Discriminatory Employment Practices Act. The rule in prohibition rests on an express conclusion of law declared by the court that: "St. Louis Christian Home is owned and operated by a religious group, i.e., the NBA, within the plain and clear meaning of those terms as they are used in Section 296.010(2), RSMo 1978."

Section 1.090 enjoins that words and phrases of a statute

"shall be taken in their plain or ordinary and usual sense, but technical words and phrases having a peculiar and appropriate meaning in law shall be understood according to their technical import."

The Commission contends that *operate*, according to word-book definition, has multiple and inconsistent meanings.[1] Therefore [the argument goes] the term is ambiguous and so resort to aide extraneous to the statutory text is proper to construe the intent of the statute. The ambiguity the Commission detects is the uncertainty as to whether by *operate* the enactment means "to conduct the daily affairs, or to supervise those who conduct the daily affairs." The aid to construction the Commission contends informed the statute, but was reject-

---

1. The Commission cites the Webster's Seventh New Collegiate Dictionary (1972) definition for the transitive verb *operate*: "1. to bring about; effect; 2. a) to cause to function: work; b) to put or keep in operation: manage . . . ."

We note other definitions of even greater amplitude: Webster's Third New International Dictionary [Unabridged] gives as equivalents for the transitive verb *operate*: "1: to cause to occur; bring about by or as if by the exertion of positive effort or influence: Initiate . . . 2 a: to cause to function, usually by direct personal effort . . . ." Also, Oxford English Dictionary, Re-issue of A New English Dictionary, (1933): "[t]o direct the working of; to manage, conduct, work, direct to an end. [Chiefly U.S.]"

ed by the court, was a regulation promulgated by the agency *after* the prohibition hearing—but before judgment—which interprets *operate* to mean "one hundred percent [100%] owned and operated by a religious or sectarian group" for exemption from liability as an *employer.* This ostensible promulgation [the Commission asserts] required the court to refuse prohibition [and confirm jurisdiction of the complaint in the Commission] since by the evidence already heard, several members of the Home Board of Directors were not communicants of the sect.

█ The contention of the Commission that a term with multiple definitions is by that fact ambiguous has no validity. The variety of usages one word connotes in different contexts, rather, is the mark of precise definition and clear expression, and not of muddled meaning. In our advanced and evolved language, there is scarcely a verb without more than one accurate usage. [See Preface, Webster's Third New International Dictionary (Unabridged)]. Ambiguity does not result, as the Commission suggests, merely because a word has multiple meanings. A word in a statute is ambiguous when that term *in context used* is susceptible of more than one meaning. See Missouri Digest, Statutes, Key 190. The term of a statute plain and clear as used in the context of enactment to a person of ordinary intelligence is not ambiguous and gives no occasion for construction. *State ex rel. School District of Kansas City v. Young,* 519 S.W.2d 328, 331[1–3] (Mo.App. 1975). That is so although the same term in another context may have a different meaning. *Shobe v. Borders,* 539 S.W.2d 330, 331[1] (Mo.App.1976).

The Commission argument posits that *operate* only is ambiguous. It concedes—without other qualification—that NBA *owns* the Home. Thus, the Commission tacitly acknowledges that *own* has a plain and ordinary meaning in the statutory usage.[2]

*Own* and *operate,* however, are conjoined in the text. They are, therefore, *in pari materia* and cognate. *City of Willow Springs v. Missouri State Librarian,* 596 S.W.2d 441, 446[7] (Mo. banc 1980). The term *operate* is no more technical than *own.* The statutory text invests no less clarity in one than in the other—and demands no more extrinsic aid to understanding. The manifest historical purpose of a statute bears on the construction the lawmaker intends for the text. *Cummins v. Kansas City Public Service Co.,* 334 Mo. 672, 66 S.W.2d 920, 925 (banc 1933). The obvious purpose of the exclusion of enterprises *owned* and *operated* by religious groups from liability as an *employer*—and so, from accountability to a governmental agency—under the Discriminatory Employment Practices Act is to avoid the church-state imbroglio the First Amendment interdicts. [See *N.L.R.B. v. Catholic Bishop of Chicago,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) which adopted a construction of a congressional statute—in the absence of a clear legislative expression of contrary intent—so to avoid a church-state constitutional conflict.] The proviso of § 296.010(2) implements that desideratum by exclusion from agency regulation, not an enterprise "one hundred percent [100%] owned and operated by a religious or sectarian group"—as the Commission rule promulgation would have it—but an enterprise simply *owned and operated* for the sectarian purpose. The presumption prevails that a statute, such as the § 296.010(2) proviso, written clearly and plainly intends what it says. *DePoortere v. Commercial Credit Corp.,* 500 S.W.2d 724, 727[1–4] (Mo.App. 1973).

There remains only to apply the statute to the evidence to determine whether the Home was *operated* in fact by a religious group, and so exempt from the governmental regulation the enactment imposes. The adjudication by the circuit court that the

---

**2.** The evidence was such that a contrary contention were not tenable. The concession, however, was not under the evidence, but *as a matter of plain statutory meaning.* The glossary definitions of *own,* however, are even more multiple than those attributed to *operate.* Taken on its own terms, therefore, the argument of the Commission that *operate* is ambiguous, but *own* is not, conforms to no logic.

operations of the Home were exempted from the Act rests on facts expressly found from the evidence [and recounted] that the Home was founded by the Christian Church, owned and administered by the NBA under the General Assembly of the sect, receives an annual allocation of funds from NBA, is subject to supervision and control of NBA as to not only the programs, but also as to designation of officers, directors and other functionaries; its articles of incorporation and by-laws are subject to prior NBA approval, the NBA supervises the daily operations of the Home, invests the Home funds, attends to the accounting functions of the Home, undertakes any capital improvement at the Home facility— among the numerous other controls. These determinations of fact—which without dispute rest on evidence—constitute substantial proof that the NBA—a *religious group,* the litigants agree—*operates* the Home. The Commission was without jurisdiction to proceed against the Home under The Discriminatory Employment Practices Act. The rule in prohibition was properly entered.

■ There was evidence, however, that there was no requirement that the Executive Director of the Home nor any employee be a member of the Christian Church sect.[3] The Commission contends that agency regulation 4 CSR 180–3.010(9) defined the statutory terms *owned* and *operated* to mean: "[a] corporation or association must be one hundred percent (100%) owned and operated by a religious or sectarian group and *being a member of that religion or sect must be a requirement for employment for that corporation or association to be exempt as an employer* under section 296.010(2), RSMo 1978" and that, although the interpretation of a statute by an agency charged with its administration is entitled to weight, the circuit court nevertheless accorded none.

Thus [concludes the Commission argument], had the court given deference due, the evidence would have compelled the determination that the Home was not *operated* by a religious group, and so not entitled to the exemption from governmental regulation under the Discriminatory Employment Practices Act. The principle that courts defer to the administrative construction of statute of the public body entrusted with execution of the law appertains especially in cases of doubt or ambiguity [*State ex rel. Curators of the University of Missouri v. Neill,* 397 S.W.2d 666, 670[3, 4] (Mo. banc 1966)]—a factor not present here. The authoritative effect of a rule of interpretation of a statute—and hence the principle of deference itself—rests on the premise that the promulgation involves skills the administrator distinctively possesses and the judge does not. "The degree of authoritative effect is likely to be low when the judges and not the administrators are the experts"—as on issues of the meaning of statutory phrases. Davis, Administrative Law Treatise § 5.05, pp. 314–316 (1958).

■ We do not confront the question whether—other questions of validity apart—the Commission regulation 4 CSR 180–3.010(9) requirements that the exempt employer be totally owned and operated by a religious group and employ only persons of that sect is a reasonable construction of the § 296.010(2) proviso. A regulation in conflict with the statute, of course, fails. *Johnson v. Labor & Industrial Relations Commission,* 591 S.W.2d 241, 244[1, 2] (Mo. App.1979). Nor do we confront whether the "one hundred percent owned and operated" precondition for exemption presents a significant risk of a First Amendment infringement as to enterprises *owned and operated* in fact, but not totally, by a religious group. See *N.L.R.B. v. Catholic Bishop of Chicago,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979).[4] We do determine that

---

**3.** The evidence was also that four of the twenty-seven members of the Home Board of Directors were not communicants of the Christian Church.

**4.** A standard comparable to the rule the Commission contends for was employed by the N.L.R.B. to determine which religious schools were properly subject to the agency jurisdiction, yet not offensive to the First Amendment religion clauses. [Thus, the posture of jurisdiction was

the Commission regulation was not duly before the circuit court and so was owed neither notice nor deference.

█ The regulation the Commission contends for was effective on *November 13, 1980,* according to 5 Missouri Register, No. 11, pp. 1333–34. The trial to the circuit court was conducted on *August 18, 1980.* [The Commission gave no evidence.] The court withheld judgment to allow the litigants to submit suggested findings of fact and conclusions of law. The Commission submitted its suggestions accompanied by a recommended decision and order on *September 17, 1980.* An appendix to that filing was a formal copy of *Proposed Amendments* to 4 CSR 180–3.010 dated as filed on *July 1, 1980*—more than a month *before* the circuit court trial. The *Proposed Amendments* included subsection (9) the Commission now asserts as the guide to construction of the statutory exemption proviso. The pendency of the *Proposed Amendments* was disclosed to the court by the Commission for the first time *after* the evidence was concluded and judgment became imminent. In the required course of rule promulgation, amendment, or recission, an administrative agency must "first file with the secretary of state a notice of proposed rulemaking and a subsequent order of rulemaking, both of which shall be published in the Missouri register by the secretary of state . . . ." § 536.021, RSMo 1978. The neglect to comply with these procedures deprives a regulation of validity. *State ex rel. Beaufort v. Public Service Commission of Missouri,* 610 S.W.2d 96, 99[1–3] (Mo. App.1980). The official register shows, as we note, that the amendments [subsection 9 included] became effective on November 13, 1980. The Order of Rulemaking which reports the amendments in the official register [5 Missouri Register, No. 11, pp. 1333–34] reports also that the Notice of Proposed Rulemaking [also required to be published by § 536.021 as a condition of valid rule-promulgation] was, in fact, given on August 1, 1980. The official publication for that purpose and for that date [5 Missouri Register, No. 8, pp. 781–89 (August 1, 1980)] gives notice of proposed amendments to other Missouri Commission on Human Rights regulations, but not the regulation [subsection (9)] now advanced for effect. A Notice of Proposed Rulemaking—and the concomitant right of opposition by comment

---

an inversion of that before us: that agency policy was as to what extent jurisdiction was properly exercised over religious schools, whereas our regulation deals with to what extent jurisdiction is properly withheld over religious enterprises.] The N.L.R.B. operated on a policy to extend its jurisdiction only to *religiously affiliated schools that were not "completely religious."* The United States Supreme Court cited with approval the rationale of the Court of Appeals [7th Circuit] decision which rejected the N.L.R.B. policy as inimical to the First Amendment values [l.c. 495]:

" 'We find the standard itself to be a simplistic black or white, purported rule containing no borderline demarcation of where "completely religious" takes over or, on the other hand, ceases. In our opinion the dichotomous "completely religious—merely religiously associated" standard provides no workable guide to the exercise of discretion. The determination that an institution is so completely a religious entity so as to exclude any viable secular components obviously implicates *very sensitive* questions of faith and tradition.' "

So, we must say, does the standard the purported Commission regulation promulgates.

The ostensible promulgation presents an even more curious anomaly: it undertakes to dispel one incident of discrimination by the encouragement of another. The Discriminatory Employment Practices Act renders unlawful the practice of an employer to discriminate against an employee not only because of race [the incident of unlawfulness before the Commission here] but also because of religion. The requirement of 4 CSR 180–3.010(9) that an employer be exempt only on condition that the religious group employ persons of that sect engenders a species of discrimination the statute prohibits.

This component of the promulgation renders the rule even more doubtful as an implementation of the statutory intent of the exemption proviso—as the Commission contends. The concern of the exemption statute—as in *Catholic Diocese of Kansas City-St. Joseph v. Labor & Industrial Relations Commission,* 618 S.W.2d 676 (Mo.App.1981)—[l.c. 679[1, 2]] "is the identity of the employer and not the nature of the duties performed by the employee" nor, in this context, the religious professions of the employees.

[as by organizations who stand with the Home]—preconditions a valid Order of Rulemaking. § 536.021.2; *State ex rel. Beaufort Transfer Company v. Public Service Commission of Missouri*, 610 S.W.2d 96, 99[1–3] (Mo.App.1980).

The authority of 4 CSR 180–3.010(9) as a rule duly promulgated is not made an issue, hence we do not rest opinion on its invalidity albeit the Commission contention of deference due presupposes a regulation declared and perfected according to the exact procedures of the statute. We assume—intimations to the contrary notwithstanding—that the notice of the proposed subsection (9) amendment was duly published on August 1, 1980, and became effective on November 13, 1980. The judgment of prohibition was entered on September 19, 1980, and so was unaffected by an agency regulation become official after that date. A *proposed* regulation still nascent affects neither the parties in interest to an administrative proceeding or the court on judicial review. The very purpose of the notice procedure for a proposed rule is to allow opportunity for comment by supporters or opponents of the measure, and so to induce a modification. §§ 536.021.5 and 536.027. To neglect the notice [as the record suggests] or to give effect to a *proposed* rule before the time for comment has run its course—that is, before final promulgation of the rule—undermines the integrity of the procedure.

The rule promulgated after judgment could not have been an issue in the litigation. The proposed rule, [presumably] filed with the secretary of state before the commencement of trial but never disclosed to the court until judgment was imminent, never was made an issue. The petition for prohibition was tried according to the rules of law and administrative regulations which attended the twenty-year existence of the Discriminatory Employment Practices Act. None of these included the standard of interpretation the Commission attributes to the exclusionary proviso of the statute.

The judgment of an absolute rule in prohibition is affirmed.

All concur.