**MISSOURIANS FOR TAX JUSTICE
EDUCATION PROJECT, et al.,
Appellants,**

v.

**Bob HOLDEN, et al., Respondents.**

No. 79708.

Supreme Court of Missouri.

Dec. 23, 1997.

Rehearing Denied Jan. 27, 1998.

Lewis C. Green, Bruce A. Morrison, Kathleen G. Henry, St. Louis, for Appellants.

Jeremiah W. (Jay) Nixon, Atty. Gen., James R. Layton, Chief Deputy Atty. Gen., Robert L. Presson, Hugh L. Marshall, Asst. Attys. Gen., Jefferson City, for Respondents.

Alan S. Mandel, Davidson, Schlueter, Mandel & Mandel, St. Louis, for Amicus Curiae.

ROBERTSON, Judge.

Missourians for Tax Justice Education Project, Inc., and the Missouri Association for Social Welfare are not-for-profit Missouri corporations. Each of these appellants paid sales tax during the state's fiscal years 1995 and 1996, but paid no income tax. Larry C. Gaines and LaVonne Shinn, also appellants, are individual Missouri residents who paid sales tax but no income tax during the same fiscal years.

Article X, section 18(b) of the Missouri Constitution requires the government to refund state revenues on a pro rata basis to Missouri state income taxpayers when "total state revenues" exceed the revenue limit established in article X, section 18(a) by more than one percent. Appellants insist that this refund provision violates constitutional guarantees of equal protection and due process because it discriminates against persons who paid no income taxes and these persons are generally poor. Appellants also claim that the entirety of the voter-approved tax and spending limitation contained in the constitu-

tion is too vague to accommodate rational application and, therefore, is void.

The trial court found the challenged provisions constitutional but issued a stay precluding the government from proceeding with its plans for distributing a refund pending this appeal. Because the validity of a provision of the state constitution is in question, we have jurisdiction. Mo. Const. art. V, sec. 3. The judgment of the trial court is affirmed. The stay previously entered by the trial court is dissolved.

## I.

At the general election in 1980, Missouri voters approved an amendment to the constitution popularly dubbed "the Hancock Amendment." Mo. Const. art. X, sec. 16-24. The purpose of the Hancock Amendment is "to rein in increases in governmental revenue and expenditures." *Roberts v. McNary,* 636 S.W.2d 332, 336 (Mo. banc 1982). *See Beatty v. Metropolitan St. Louis Sewer District,* 867 S.W.2d 217, 221 (Mo. banc 1993) ("Reduced to its essence, the Hancock Amendment reveals the voters' basic distrust of the ability of representative government to keep its taxing and spending requirements in check.")

To achieve its purpose of reining in increases in governmental revenue and expenditures, the constitution establishes an annual revenue limit for state government and requires the state to disgorge the excess when its annual revenues exceed the constitutional revenue ceiling.

(a) There is hereby established a limit on the total amount of taxes which may be imposed by the general assembly in any fiscal year on the taxpayers of this state.

Effective with fiscal year 1981–1982, and for each fiscal year thereafter, the general assembly shall not impose taxes of any kind which, together with all other revenues of the state, federal funds excluded, exceed the revenue limit established in this section. The revenue limit shall be calculated for each fiscal year and shall be equal to the product of the ratio of total state revenues in fiscal year 1980–1981 divided by the personal income of Missouri in calendar year 1979 multiplied by the personal income of Missouri in either the calendar year prior to the calendar year in which appropriations for the fiscal year for which the calculation is being made, or the average of personal income of Missouri in the previous three calendar years, whichever is greater.

(b) For any fiscal year in the event that total state revenues exceed the revenue limit established in this section by one percent or more, the excess revenues shall be refunded pro rata based on the liability reported on the Missouri state income tax (or its successor tax or taxes) annual returns filed following the close of such fiscal year. If the excess is less than one percent, this excess shall be transferred to the general revenue fund.

Mo. Const. art. X, sec. 18(a) and (b).

Appellants claim that a pro-rata refund to income taxpayers violates equal protection, U.S. Const. amend XIV, and due process.[1] In support of their equal protection argument, appellants offer two arguments: First, they claim that the purpose of the Hancock Amendment is not a legitimate state purpose.

---

**1.** Appellants' due process argument is apparently not serious. Their brief makes its due process argument in less than a full page and cites no case authority. Appellants insist that a refund of state moneys collected by all of the state's taxes to income taxpayers only is a taking from the poor for the private advantage of the not-poor, without due process of law. Appellants are convinced that this scheme violates the Fifth and Fourteenth Amendments to the federal constitution and article I, sections 10 and 28 of the state constitution.

If there is a taking in this case, it occurs when the tax is demanded and collected. The refund is not a taking for the private purposes of the not-poor because the funds from which the refund is made were not collected for that purpose. The taxes collected are collected for the purpose of funding governmental operations and programs, many of which directly benefit the poor whom these appellants claim to champion. Until a fiscal year closes, the government does not know whether it owes a refund or not.

We are not prepared to hold—as appellant's argument seems to assert when properly understood—that the government's *collection* of taxes constitutes a taking in violation of due process. The Sixteenth Amendment to the federal constitution and article X, sections 1 and 2 of the state constitution resolve that argument in the government's favor.

Second, appellants urge this Court to declare poverty a suspect classification to which strict scrutiny equal protection analysis applies.

### A.

When considering claims that a law violates the Equal Protection Clause, the first step is to determine whether the statutory scheme "operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution...." *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973); *State Board of Registration v. Giffen,* 651 S.W.2d 475, 479 (Mo. banc 1983). If so, the statutory scheme receives strict judicial scrutiny to determine whether the classification is necessary to accomplish a compelling state interest. *Id.* If the classification neither burdens a suspect class, nor impinges upon a fundamental right, the only issue is whether the classification is rationally related to a legitimate state interest. *Friedman v. Rogers,* 440 U.S. 1, 17, 99 S.Ct. 887, 898, 59 L.Ed.2d 100 (1979); *Giffen, supra,* 651 S.W.2d at 479. The burden is on the person attacking the classification to show that it does not rest upon any reasonable basis and is purely arbitrary. *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78–79, 31 S.Ct. 337, 340–41, 55 L.Ed. 369 (1911); *City of St. Louis v. Liberman,* 547 S.W.2d 452, 458 (Mo. banc 1977). Under this analysis a classification is constitutional if any state of facts can be reasonably conceived that would justify it. *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961); *Liberman, supra,* 547 S.W.2d at 458.

A suspect classification exists where a group of persons is legally categorized and the resulting class is "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process." *Rodriguez,* 411 U.S. at 28, 93 S.Ct. at 1293–94. Classifications based on wealth/poverty do not fit this description.

That wealth classifications *alone* have not necessarily been considered to bear the same high degree of suspectness [sic] as have classifications based on, for instance, race or alienage may be explainable on a number of grounds. The "poor" may not be seen as politically powerless as certain discrete and insular minority groups.... [P]ersonal poverty is not a permanent disability; its shackles may be escaped. Perhaps most importantly, though, personal wealth may not necessarily share the general irrelevance as a basis for legislative action that race or nationality is recognized to have.

(Emphasis added). *Id.* at 121, 93 S.Ct. at 1342. (Marshall, J., dissenting). Thus, the United States Supreme Court "has never ... held that wealth discrimination *alone* provides an adequate basis for invoking strict scrutiny...." (Emphasis added). *Id.* at 29, 93 S.Ct. at 1294–95.

The use of the word "alone" in the *Rodriguez* majority opinion and dissent is significant. Where the Supreme Court has applied strict scrutiny to a wealth-based classification, it has found that the wealth-based classification also implicated a fundamental right.[2] As appellants lay no claim to a loss of any fundamental right in connection with the refund plan contained in section 18(b), they ask this Court to declare poverty a suspect classification on that basis alone. We decline their invitation and hold that the classification between income taxpayers and other taxpayers established in section 18(b) does not create a suspect classification.

### B.

A legal classification considered under a rational basis standard will survive

---

2. For example, one group of cases deals with the right to vote or be a candidate for office. *Bullock v. Carter,* 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (candidates' filing fees). E.g., *Harper v. Virginia Board of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (poll tax). A second group addresses wealth classifications that impinge on access to the judicial system. E.g., *Douglas v. California,* 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963) (ability to pursue an appeal); *Griffin v. Illinois,* 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956) (payment of transcript on appeal fees).

judicial examination if the state's purpose in creating the classification is legitimate, *Zobel v. Williams,* 457 U.S. 55, 60, 102 S.Ct. 2309, 2312–13, 72 L.Ed.2d 672 (1982), and "if any state of facts reasonably may be conceived to justify" the classification chosen to accomplish that purpose. *McGowan v. Maryland,* 366 U.S. at 426, 81 S.Ct. at 1105.

■ Appellants rely on *Zobel* and *Quinn v. Millsap,* 491 U.S. 95, 109 S.Ct. 2324, 105 L.Ed.2d 74 (1989), apparently convinced that these cases reject wealth-based classification under a rational basis test and, therefore, control this case. We disagree.

In *Zobel,* Alaska decided to distribute a financial windfall to the state resulting from the discovery of oil at Prudhoe Bay to the state's adult residents. The plan, initiated in 1979, permitted each adult resident to receive a specified dollar amount for every year of residency since statehood in 1959. Short-term Alaska residents challenged the plan, claiming that the enhanced dividend payment to long-term Alaskans violated the Equal Protection Clause. Alaska argued that the dividend created a financial incentive for persons to establish and maintain residence in Alaska, encouraged prudent management of the fund created from the oil revenues and recognized residents' undefined contributions to the state during their years of residency since statehood. The plurality opinion found the first two objectives "not rationally related to the distinctions Alaska seeks to make between newer residents and those who have been in the State since 1959." *Id.* at 61, 102 S.Ct. at 2313. The third rationale "is not a legitimate state purpose" *id.* at 63, 102 S.Ct. at 2314, because the Equal Protection Clause does not recognize an apportionment of state services based on length of residency in the state. *Shapiro v. Thompson,* 394 U.S. 618, 632–33, 89 S.Ct. 1322, 1330–31, 22 L.Ed.2d 600 (1969). For these reasons, the *Zobel* court struck down the Alaska dividend plan as a violation of equal protection.

In *Quinn,* the Supreme Court struck down a provision of the Missouri constitution, art. VI, sec. 30(a), requiring that persons appointed to a commission to consider reorganization of city and county government in the St. Louis area own real property. Relying on *Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970), the Supreme Court held that the landowner requirement was not rationally related to any legitimate state interest.

Appellants claim that the Hancock Amendment contains an illegitimate purpose. They insist that the purpose of the Hancock Amendment is to provide a refund to income taxpayers. Under *Zobel,* if the government's purpose is not legitimate, the means chosen to implement that purpose, however rational, cannot save the law from condemnation by the Equal Protection Clause.

Appellant's argument, while serving appellants' own purposes, confuses means with end and ignores this Court's long-standing, consistent reading of the Hancock Amendment's purpose: "to rein in increases in governmental revenue and expenditures." *Roberts,* 636 S.W.2d at 336. Constitutional demands that the government operate in a fiscally-prudent manner and live within its fiscal means are legitimate state purposes.

If the purposes of the law are legitimate, all that remains is to determine whether the means chosen to implement the law is rationally related to achieving that purpose. The refund mechanism employed by section 18(b) is rationally related to the Hancock Amendment's purpose for at least four reasons.

First, the refund commanded by section 18(b) is a penalty imposed on the government for collecting too much revenue. To make the government give back money to the persons from whom it took the excess revenue rationally serves the purposes of the Hancock Amendment previously expressed.

■ Second, the specific refund method chosen in section 18(b) to carry out the amendment's purpose is also rational. The amendment's revenue calculations are year-specific. An income taxpayer's actual contribution to the government's excess revenue in the fiscal year in question is readily and accurately ascertainable. It is true, as appellants claim, that the state can estimate a person's sales tax payments for a given fiscal period. But it is also true that the existence of another, even more mathematically precise method of achieving the constitution's pur-

poses does not render the chosen method irrational for equal protection purposes. "[R]ational distinctions may be made with substantially less than mathematical exactitude." *New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976).

Third, any other form of refund suggested by appellants would not refund excess state revenue on the basis of a person's contribution to the excess. It is true that a per capita refund to all state residents would provide refunds to persons who paid no income tax but such a refund would make no effort to determine any person's share of the contribution to the state's excess revenue. If a refund based on an estimate of an individual's sales tax liability forms the basis for a refund—as appellants' counsel suggested it might during oral argument—the estimate can be determined only by reference to individual income. A refund mechanism that focuses on income taxpayers accounts indirectly for sales tax payments made by most income taxpayers and more accurately reflects a person's actual contribution to the state's excess revenue than either a per capita or a sales tax refund would. For this reason, an income tax refund is more mathematically precise in directing refunds to persons based on actual contributions to the state's excess revenue than either a per capita tax refund or a refund based solely on sales tax estimates.

Fourth, a refund system that focuses on income tax allows persons who earned income in Missouri and paid income tax to this state but who live in other states to participate. This state's sales tax scheme permits no identification of persons who pay sales tax. An income tax refund plan defeats any argument, however specious, that the Hancock Amendment discriminates against non-Missouri residents in violation of the negative command[3] of the Commerce Clause, U.S. Const. art. I, sec. 8, cl. 3, the Privileges and Immunities Clauses, U.S. Const. art. IV, sec. 2, cl. 1, and amend. XIV, sec. 1, or the right to travel announced in *Shapiro.*

---

**3.** The Commerce Clause "embodies a negative command forbidding the States to discriminate against interstate trade." *Associated Industries*

These reasons are sufficient to permit us to conclude that the Hancock Amendment furthers a legitimate state purpose and that the refund mechanism employed in section 18(b) is a rational means of achieving that purpose.

## II.

Appellants' second point asserts that the revenue limit contained in section 18(a) is too vague to permit enforcement. "Any effort to assign various revenues of the state to 'total state revenues' or to exclude them is an arbitrary exercise. By the same token, there is no rational basis for determining what should go into ... the 'personal income of Missouri.'" App. Br. at 24. Though the words do not appear in the second point in their brief, we assume that casserole of conclusions and catchphrases appellants employ assert a due process violation.

 Appellant's argument confuses ambiguity with vagueness. Vagueness that violates due process exists where a law speaks with such uncertainty that it permits arbitrary and discriminatory enforcement, *Papachristou v. City of Jacksonville,* 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972), or in such a way that a person of ordinary intelligence does not receive fair notice from the language employed in the law what conduct that law requires or forbids. *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 811–12, 98 L.Ed. 989 (1954).

Courts have long accepted responsibility for providing meaning to laws that are ambiguous. Well-accepted canons of construction inform this process, as does the Court's duty to uphold ambiguous laws where it is possible to interpret those laws in a manner that conforms to the demands of the constitution. *See Buchanan v. Kirkpatrick,* 615 S.W.2d 6, 12 (Mo. banc 1981) ("This Court's duty is not to seek to condemn the [Hancock] amendment, but to seek to uphold it if possible.").

 Ambiguity in a law does not violate due process. "[T]he constitutional due pro-

---

*of Missouri v. Lohman,* 511, U.S. 641, 646, 114 S.Ct. 1815, 1820, 128 L.Ed.2d 639 (1994).

cess demand is met if the words used bear a meaning commonly understood by persons of ordinary intelligence." *State v. Allen*, 905 S.W.2d 874, 877 (Mo. banc 1995).

## A.

■ "Total state revenues" includes all general and special revenues, license and fees, excluding federal funds, as defined in the budget message of the governor for fiscal year 1980–1981. Total state revenues shall exclude the amount of any credits based on actual tax liabilities or the imputed tax components of rental payments, but shall include the amount of any credits not related to actual tax liabilities.

Mo. Const. art. X, sec. 17(1). In part pertinent to our discussion, section 18(a) provides:

The revenue limit shall be calculated for each fiscal year and shall be equal to the product of the ratio of total state revenues in fiscal year 1980–1981 divided by the personal income of Missouri in calendar year 1979 multiplied by the personal income of Missouri in either the calendar year prior to the calendar year in which appropriations for the fiscal year for which the calculation is being made, or the average of personal income of Missouri in the previous three calendar years, whichever is greater.

In *Buechner v. Bond*, 650 S.W.2d 611 (Mo. banc 1983), this Court faced two questions: Whether "unspent revenue from prior fiscal years 1979–80, the 1980–81 opening balance, is a component portion of general revenue to be included in total state revenue" and whether " 'total state revenues' as used in sections 18(a) and 17(1) of article X is not capable of definition and therefore void." *Id.* at 612. We · quote the Court's decision at length because it clearly describes the Court's duty and directly addresses appellants' second point.

The rules applicable to construction of statutes are applicable to the construction of constitutional provisions; the latter are given broader construction due to their more permanent character. *Boone County Court v. State*, 631 S.W.2d 321, 325 (Mo. banc 1982). Words used in constitutional provisions must be viewed in context; their use is presumed intended, and not meaningless surplusage. *Roberts v. McNary*, 636 S.W.2d 332, 335 (Mo. banc 1982). The words used in constitutional provisions are interpreted so as to give effect to their plain, ordinary and natural meaning. *Boone County*, 631 S.W.2d at 324; *State ex inf. Danforth v. Cason*, 507 S.W.2d 405, 408 (Mo. banc 1973). The plain, ordinary, and natural meaning of words is that meaning which the people commonly understood the words to have when the provision was adopted. *Boone County*, 631 S.W.2d at 324; *Cason*, 507 S.W.2d at 408. The commonly understood meaning of words is derived from the dictionary. *Boone County*, 631 S.W.2d at 324.

\* \* \*

Every word in a constitutional provision is presumed to have effect and meaning. *McNary*, 636 S.W.2d at 335. The word "revenue" is not defined in any of these sections [of the Hancock Amendment]; therefore, it will be accorded its plain, ordinary, and natural meaning as found in the dictionary. "Revenue" is defined as "the annual or periodical yield of taxes, excises, customs, duties, and other sources of income that a nation, state or municipality collects and receives into the treasury for public use...." Webster's Third New International Dictionary 1942 (1964).

Based on the common, ordinary definitions upon which this Court relied in *Buechner*, it is apparent that "total state revenue" is the sum (total) of "taxes, excises, customs, duties, and other sources of income" the state receives into its treasury in a given fiscal year. Except as to "credits not related to actual tax liabilities," this is a cash basis accounting definition because it requires actual receipt of the revenue by the state. Moneys not paid into the treasury, *see* Mo. Const. art. IV, sec. 15 (defining nonstate funds), or not received in the fiscal year in question are not part of "total state revenues."

The Court's interpretation of "total state revenues" in *Buechner* is consistent with

time-honored principles of constitutional construction. It resolves all accounting controversies surrounding the meaning of total state revenues. It also renders the meaning of "total state revenues" sufficiently precise as to permit enforcement. Section 18(a) does not violate due process.

### B.

■ The constitution defines "personal income of Missouri" as the total income received by persons in Missouri from all sources, as defined and officially reported by the United States Department of Commerce or its successor agency." Mo. Const. art. X, sec. 17(2). Appellants concede that the Department of Commerce publishes the calculation to which section 17(2) refers. They complain, however, that the figure is constantly updated over the course of years as more information becomes available to the Commerce Department. As a result, appellants argue, the true amount of income received by persons in Missouri can never be precisely known. Significantly, appellants do not attack the government's selection of a particular Commerce Department report calculating personal income of Missouri.

The purpose of the tax and spending limitations contained in the Hancock Amendment is not thwarted if the calculation of the revenue limit is not accurate to the mill. The definition of "personal income of Missouri" contained in section 17(2) erects a sufficiently definable standard to permit those who wish to enforce the revenue limit to do so.

### III.

The judgment of the trial court is affirmed. The stay previously entered by the trial court is dissolved.

All concur.