Janet G. LINTON, D.V.M., Respondent,

v.

MISSOURI VETERINARY MEDICAL BOARD, Appellant.

No. 80964.

Supreme Court of Missouri, En Banc.

April 13, 1999.

Rehearing Denied May 11, 1999.

RSMo 1994, and 4 CSR 270–2.031(1), denied Janet Linton's application for a license to practice veterinary medicine in Missouri because it took Linton four times to pass a required examination. Linton contested this denial, claiming the Board's action was arbitrary and capricious and that the statute and regulation upon which the Board relied violate her constitutional right to equal protection. The Circuit Court of Cole County agreed with Linton and reversed the decision of the Board. Because Linton challenges the constitutionality of sec. 340.240.6, this Court has exclusive jurisdiction of the appeal. *Mo. Const. art. V, sec. 3.* The judgment of the trial court is reversed, and the decision of the Board is affirmed.

I.

Linton graduated from the University of Missouri School of Veterinary Medicine in May of 1995. In order to be licensed to practice veterinary medicine in Missouri, however, Linton needed to achieve a certain minimum score on the National Board Examination (NBE), the Clinical Competency Test (CCT), and the State Board Examination (SBE). *Sec. 340.240; 4 CSR 270–2.031(1)* and *(2).* In December 1994, prior to her graduation, Linton took and failed the NBE. Linton passed the CCT in January 1995. In April 1995, Linton passed the SBE but again failed the NBE. In December 1995, Linton took the NBE for a third time in Missouri and failed for the third time. In April 1996, Linton took the NBE in Illinois and finally received the passing score.

After passing the NBE in Illinois, Linton applied to the Board for a license to practice in Missouri. The Board denied her application because Linton had taken the NBE a total of four times. Linton petitioned the Administrative Hearing Commission to reverse the Board's decision and to order the Board to issue her a license. The Commission affirmed the Board's decision, leaving the constitutional issues for the court to decide. *State Tax Comm'n v. Administrative Hearing Commission,* 641 S.W.2d 69, 75 (Mo. banc 1982). Linton petitioned the Circuit Court of Cole County for judicial review of the Board's decision, alleging several

Jeremiah W. (Jay) Nixon, Atty. Gen., Mary Moulton Bryan, Asst. Atty. Gen., Jefferson City, for Appellant.

Audrey Hanson McIntosh, Hawkins Law Offices, LLC, Jefferson City, for Respondent.

JOHN C. HOLSTEIN, Judge.

The Missouri Veterinary Medical Board (the Board), pursuant to sec. 340.240.6,

grounds for reversing the Board's decision. The circuit court held that the Board's action was arbitrary and capricious, that the statute and regulation violated Linton's right to equal protection, and reversed the Board's decision.

## II.

On appeal, Linton raises only one point, arguing that the Board's action was "unsupported, arbitrary, capricious and unreasonable" because the Board licensed two other allegedly similarly situated applicants, thereby violating her right to equal protection. Linton also asserts in her point that the statute and regulation violate equal protection because the three-examination limitation is not rationally related to any legitimate state interest.

Appellant's point relied on also suggests that the Board has the burden to establish the constitutionality of the statute by producing evidence that the three-examination requirement serves a governmental interest. That premise is incorrect. Statutes are presumed to be constitutional. One attacking the constitutionality of a statute "bears an extremely heavy burden." *Consolidated School Dist. v. Jackson Co.*, 936 S.W.2d 102 (Mo. banc 1996). " 'When the constitutionality of a statute is attacked, constitutionality is presumed, and the burden is upon the attacker to prove the statute unconstitutional.' The Court will not invalidate a statute 'unless it clearly and undoubtedly contravenes the constitution' and 'plainly and palpably affronts fundamental law embodied in the constitution.' " *Id.* (citations omitted).

## A.

Linton asserts that the Board's action was arbitrary and capricious and that the Board violated her right to equal protection because two similarly situated applicants were licensed. The claims fail because the other applicants put forward by Linton were not similarly situated with her.

Section 340.240.6 provides that if an applicant fails an examination, the applicant may retake the examination except that "[n]o person may take the examination more than three times." The Board regulation 4 CSR 270–2.041(2) interprets that limitation to mean "no person may take any examination more than three (3) times either in or out of Missouri to qualify for licensure in Missouri." This prohibition against taking the examination more than three times went into effect on August 28, 1992. *4 CSR 270–2.041(2)*. All three times that Linton took and failed the NBE were after August of 1992. The other two applicants, who she claims were similarly situated, did not take any examination more than three times after the effective date of the statute. Linton would read the statute and regulation as preventing the Board from licensing anyone after August of 1992 who had ever taken the examination more than three times. But even where retrospective application of a statute is permitted, statutes are usually construed to operate prospectively only. *Utilicorp United, Inc. v. Director of Revenue*, 785 S.W.2d 277, 278 (Mo. banc 1990). The statute and regulation, as properly construed by the Board, only prohibit an applicant from taking an examination more than three times after August of 1992. Linton has not shown that either of the other two applicants was allowed to take the examination more than three times after August of 1992. Thus, the Board's denial of her license was not arbitrary and capricious nor did the decision violate equal protection on the basis of any differential treatment of her.

## B.

Linton next claims that the statute and regulation violate her constitutional right to equal protection because the three-examination limitation is not rationally related to any legitimate state interest. As previously noted, Linton has the burden of showing that this legislatively created classification does not have a rational basis. *Casualty Reciprocal Exchange v. Missouri Employers Mut. Ins. Co.*, 956 S.W.2d 249, 257 (Mo. banc 1997). Under a rational basis standard, the three-examination limitation will survive judicial scrutiny if the state's purpose in creating the classification is legitimate and "if any statement of facts reasonably may be conceived to justify the means chosen to accom-

plish that purpose." *Missourians for Tax Justice Education Project v. Holden,* 959 S.W.2d 100, 103–04 (Mo. banc 1998)(quoting *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)).

Linton argues that there is no legitimate state interest in limiting the number of times a required examination can be taken. The only objective Linton can come up with is to limit the number of veterinarians in Missouri. However, healthy domestic animals, a safe food supply and a sound agricultural economy in this state are heavily dependent on quality veterinary services. Thus, the legislature has a legitimate interest in establishing a high level of competence for veterinarians in Missouri. Requiring applicants to pass any test is itself a limitation that treats applicants differently and limits the number of veterinarians in Missouri. Requiring an applicant to pass an examination in at least three attempts simply raises the barrier to a somewhat higher level; thus, the interest of the legislature in enacting sec. 340.240.6 is the same interest as establishing a test in the first place.

Once a legitimate interest can be articulated, all that remains is whether the means chosen, the three-examination limit, is rationally related to achieving that purpose. *Missourians for Tax Justice,* 959 S.W.2d at 104. As evidence that there is no reasonably conceivable basis for the limitation, Linton points out that only Alabama has a similar absolute limitation, and only Alabama, Florida and Tennessee have a three-examination limitation at all, and the Model Veterinary Practice Act does not contain any such limitation. The mere fact that most or even all states have adopted less stringent policies as to who may practice veterinary medicine is not evidence that the policy chosen by our General Assembly is not rationally related to promoting quality veterinary services.

Linton also points to testimony of her expert witness, an associate professor of veterinary medicine and surgery from the University of Missouri. In addition to over twenty years of experience in giving and grading examinations at the university, the professor testified that he had written questions for the NBE and the CCT and had reviewed completed examinations. Based on this experience, Linton's attorney asked the professor whether, in his opinion, a veterinarian was competent to practice if that veterinarian was not able to pass the NBE in a certain number of attempts. The professor answered, "I guess my opinion is that I'm not sure," but the professor did believe that there should be "an escape clause." However, when asked whether he let students retake examinations in his class, the professor admitted that, "Usually, we don't." Though neither the question nor answer were couched in terms of reasonable scientific certainty or research data, the expert opined that a rational basis of the three-examination limit could be "protectionism" of the number of veterinarians in practice. But he concluded that the "three time" requirement had very little impact on the ability to retain "qualified people" in Missouri. He gave no testimony indicating that the cost or availability of competent veterinary services had been adversely affected by the requirement. This evidence falls far short of establishing that those who must take the examination four or more times before passing are of equal or greater competence than those who pass the test in three or fewer attempts. Moreover, this evidence falls short of establishing that the sole purpose or effect of the legislative enactment was to artificially limit the number of competent veterinarians licensed in Missouri.

As stated above, under a rational basis test, the Court does not have to determine whether the legislature "should have" done something different or whether there is a better means to accomplish the same goal, and certainly not whether the chosen means is the best method. The fact that Missouri has decided to hold its veterinarians to a higher standard than most states does not show that there is no reasonable connection between competence and passing the examination in at least three attempts. Even Linton's own expert witness could not say that there was no connection between competence and the number of times it takes an applicant to pass a standardized examination. "If the question of the legislative judgment remains at least debatable, the issue settles on the side of validity." *Mahoney v. Doerhoff Sur-*

*gical Services,* 807 S.W.2d 503, 513 (Mo. banc 1991). Thus, Linton has failed to meet her burden of showing it was irrational for the legislature to decide that a veterinarian who can pass a competency examination in three or fewer attempts is more competent than one that takes four or more attempts to pass.

### III.

■ Neither Linton's point relied on nor the argument portion of her brief challenges the regulation as being arbitrary because it is more expansive than the statute. Though Linton made this claim in her petition to the circuit court, she chose to omit it from her claims on appeal. In any event, the Board's action cannot be arbitrary, capricious or unreasonable in following a regulation if that regulation is valid. A regulation is valid "unless unreasonable and plainly inconsistent" with the statute under which the regulation was promulgated. *Foremost–McKesson, Inc. v. Davis,* 488 S.W.2d 193, 197 (Mo. banc 1972). A regulation is not unreasonable merely because of a subjective feeling that the regulation is arbitrary or unduly burdensome.[1] *Id.* at 197–98.

■ Here, the regulatory prohibition against accepting a fourth test score taken either in or outside of Missouri is consistent with the sec. 340.240. In sec. 340.240.4, the legislature granted the Board "sole discretion on whether or not to accept for transfer a score from another state's licensing authority." A few subsections later, the legislature stated, "No person may take the examination more than three times." *Sec. 340.240.6.* The Board then promulgated its regulation that "no person may take the examination more then three (3) times either in or out of Missouri to qualify for licensure in Missouri." *4 CSR 270–2.041(2).* "The interpretation and construction of a statute by an agency charged with its administration is entitled to great weight." *Foremost–McKesson, Inc.,* 488 S.W.2d at 197.

■ The Board's regulation interprets sec. 340.240.6 as prohibiting the Board from exercising any discretion in transferring a score from out of state that was achieved on a fourth attempt. This interpretation is consistent with the earlier subsection granting the Board sole discretion in transferring an out of state score. The Board still reserves full discretion in transferring an out of state score from tests one, two and three. Consistent with subsection 6, however, the Board concluded it did not have discretion to accept an out of state score from test four or beyond. In light of the policy expressed in the statute and giving the Board's interpretation "great weight," the interpretation is certainly reasonable.

Therefore, the Board's action was not arbitrary, capricious or unreasonable in denying Linton a license after passing the NBE on her fourth attempt because this denial was consistent with a valid regulation that reasonably interpreted sec. 340.240.6. The real question, and the question focused on by Linton's brief, is whether the statute is valid under equal protection analysis.

### CONCLUSION

As previously noted, the three-examination limitation does not violate equal protection. The judgment of the circuit court is reversed, and the decision of the Board is affirmed.

BENTON, C.J., LIMBAUGH and COVINGTON, JJ., concur.

WOLFF, J., dissents in separate opinion filed.

PRICE and WHITE, JJ., concur in opinion of WOLFF, J.

MICHAEL A. WOLFF, Judge, dissenting.

Janet G. Linton, D.V.M., challenges on equal protection grounds the provision of section 340.240.6 [1] that limits an applicant to no more than three attempts to pass the

---

1. Contrary to the dissent's suggestion, Linton's expert witness merely testified that he did *not* "personally feel that it makes any difference to whether a person passes an exam the first or the fifth time." As stated above, the witness' *expert* opinion was that he was "not sure" whether the number of times it takes to pass an examination makes any difference.

1. All references are to RSMo 1994 unless otherwise indicated.

licensing examination. Dr. Linton took the National Board Examination in Illinois and received a score substantially above Missouri's pass rate for that examination. Because Dr. Linton had previously taken the examination three times unsuccessfully in Missouri, the Missouri Veterinary Medical Board denied her a license.

The statute and the Board's regulation forever bar Dr. Linton from licensure in Missouri. Because the record in this case fails to show that this absolute bar is rationally related to protecting the public from unqualified veterinarians, I would hold that the absolute bar violates Dr. Linton's right to equal protection of the law. I therefore respectfully dissent.

### The Veterinary Medical Examination

Dr. Linton was graduated from the University of Missouri's veterinary medical school in 1995. To be licensed as a veterinarian requires, in addition to the doctorate degree in veterinary medicine, successful completion of three examinations: (1) The National Board Examination developed under the National Board Examination Committee for Veterinary Medicine, which is used in most states; (2) The Clinical Competency Test, and (3) The State Jurisprudence Examination (or "Missouri State Board Examination.")

Dr. Linton has passed all three examinations, but the issue here is whether the Board can deny her a license under the Board's regulation, purportedly based on section 340.240.6, because her passage of the National Board Examination was preceded by three unsuccessful attempts. On her fourth taking, which was in Illinois—a state that has no limit on the number of attempts—Dr. Linton scored 483, well above the Missouri passing point.[2]

Missouri uses the results of the National Board Examination and sets the passing score at 425; section 340.240.4 authorizes the Board to establish the passing score. The examination consists of 400 multiple choice questions selected from a bank of some 15,-000 questions (presumably each question counts for more than one point, as the passing grade in Missouri is higher than the number of questions). Questions on each administration of the national examination differ from those of previous examinations, though the range of subjects tested remains the same. Thus, as the Administrative Hearing Commission found in this case, the National Board Examination "is an excellent measure of a candidate's knowledge, and its efficacy is *not* less for a candidate who has taken it more than three times." (Emphasis added.) In other words, one does not "learn" the examination by multiple takings. Dr. Linton's expert witness was Dr. Robert Bruce Miller, of the University of Missouri School of Veterinary Medicine, who helped develop the National Board Examination. The Administrative Hearing Commission's conclusion is supported by Dr. Miller's testimony that the National Board Examination shows that a candidate is qualified whether she succeeds on the first or fifth attempt.

Prior to 1992, the Missouri Veterinary Medicine Board by regulation limited a candidate to three attempts at the National Board Examination. The regulation provided that after three failed attempts the applicant take additional education and then seek permission from the Board to take the examination again. In 1992 in *Perryman v. Missouri Board of Registration for the Healing Arts*, AHC No. 92–0000 29HA, the Administrative Hearing Commission ruled that a similar regulation was unenforceable without statutory authority. Between this decision and August 1992, when section 340.240 was amended, the Board of Veterinary Medicine did not enforce the regulation. In addition, the Board's present and former executive directors testified that there have been no safeguards or independent verification of the number of times the applicants stated they took the examination on their application. The 1992 General Assembly enacted an amendment to the licensing statute, in section 340.240.6, which reads: "No person may take the examination more than three times."

---

2. Dr. Linton's previous scores were 364 in December, 1994, 403 in April, 1995, and 383 in December, 1995.

The Board then promulgated a regulation that is arguably more restrictive than the statute: "Effective August 28, 1992, no person may take any examination more than three (3) times *either in or out of Missouri* to qualify for licensure in Missouri." 4 CSR 270–2.041 (Emphasis added).

When Dr. Linton achieved the score of 483 on the National Board Examination, administered in Illinois, she applied for a Missouri license. She was rejected by the Board on the basis that she previously had taken the examination three times. Denial of her license was appealed to the Administrative Hearing Commission, which, lacking authority to rule on the constitutional issue, upheld the Board's denial of the license. On appeal to the circuit court for Cole County, Dr. Linton prevailed on her equal protection claim.

It should be noted that there might be a statutory basis on which to resolve this case. Specifically, one could observe that the regulation adopted by the Board restricting licensure to those who have taken the examination three or fewer times whether in or out of Missouri is inconsistent with the statute. The statute, as stated, could be limited by its terms only to examinations taken in Missouri, and Dr. Linton's application would be addressed to the Board's discretion under section 340.240.4 to transfer a score from another state. With this interpretation, the Board's action could then be reviewed on the basis of whether its action in denying her a license is "arbitrary, capricious, and unreasonable" in violation of section 536.140.2(6). Dr Linton's "point relied on" recites the familiar incantation of the judicial review statute that the Board's action is "arbitrary, capricious, and unreasonable" and was thus "an abuse of the Board's discretion," but the judicial review statute, section 536.140.2(6) is not cited. Where a constitutional challenge can be obviated by deciding a case on statutory grounds, we should decide the case without reaching the constitutional question. *See, St. Louis Christian Home v. Missouri Commission on Human Rights*, 634 S.W.2d 508, 513 (Mo.App.1982), and *Simpson v. Kilcher*, 749 S.W.2d 386, 390 (Mo.1988).[3] However, since Dr. Linton does not raise this issue explicitly, I will accept the parties' apparent notion that the regulation is consistent with the statute and deal with the equal protection claims.

### The Equal Protection Claims

Dr. Linton's first equal protection argument centers on a kind of "playground" theory of equal protection, that is, that she should be given the same treatment as was afforded to two other applicants who were four-time takers. However, the other two four-time takers were candidates who had failed the examination prior to the August 1992 effective date of the amendment to section 340.240.6. The statute did not specify that the three-time limit was prospective, or should be applied to those who had already taken the examination once, twice, or three times before the effective date. In any event, it was reasonable for the Board to apply the statute prospectively and not to count the examination attempts that occurred prior to August 1992. Moreover, if the other two applicants received some preference, because of their earlier taking of the examination, Dr. Linton is without standing to complain, in much the same way that she should not compare her own situation with that of those examination takers who took it more than three times and were licensed prior to August 1992. Moreover, this theory of equal protection would deny the legislature and the Board the ability to make changes in the licensing examination system where such changes would make licensure

---

**3.** A clear statement of this principle is found in *International Association of Machinists v. Street*, 367 U.S. 740, 749–750, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), which, quoting an earlier case, states:

"'When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.' *Crowell v. Benson*, 285 U.S. 22,62, 52 S.Ct. 285, 76 L.Ed. 598."

*See also, NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), and Sunstein, *"Interpreting Statutes in the Regulatory State,"* 103 Harvard L.R. 405, 468–469 (1989).

more difficult for future applicants than for current applicants.

Dr. Linton's serious equal protection challenge inheres in her argument that the distinction drawn by the statute and regulation does not bear some rational relationship to a legitimate state purpose, is purely arbitrary, and therefore fails even the low level of scrutiny given to legislative judgments under the equal protection clause. *See, e.g., Mahoney v. Doerhoff Surgical Services, Inc.,* 807 S.W.2d 503 (Mo. banc 1991); *Missourians for Tax Justice v. Holden,* 959 S.W.2d 100, 103 (Mo. banc 1997). Dr. Linton must show that the classification does not rest on any reasonable basis and is purely arbitrary. Under the record, I believe that she has made this showing.

There is something inherent in the American culture about three strikes, probably because of our national pastime. If the state were to allow Dr. Linton and other doctorate applicants only one try, most of us would say that the state action was arbitrary and unreasonable. However, even in baseball, a batter is allowed more than three swings because a foul ball, which normally counts as a strike, does not count when it occurs on the third strike. Thus a batter may swing at several pitches before getting a hit, and it is no less a hit than if it had occurred on the first or second swing. By Dr. Miller's testimony, a pass on the fourth try is no less a hit than a passing grade on the first try. The analogy to baseball is not entirely apt, because after three strikes, the batter is only "out" -- not banned for eternity.

Dr. Linton was permitted to take the examination in Illinois. It is precisely the same examination administered at exactly the same time as the examination administered to veterinary licensure candidates in Missouri. She scored 483, some 57 points higher than necessary for passing in Missouri. The record shows that her request for recognition of the passing examination score was based on the Board's authority granted under section 320.240.4. Thus, the issue is this: Is it acceptable for the Board to refuse to recognize the results of the National Board Examination administered to Dr. Linton on which she scored a 483? In the absence of any justification other than its own regulation, the Board's action is entirely arbitrary.

Dr. Miller's testimony that the result of the examination is just as valid on the fifth taking as on the first taking is unrebutted. There is simply no basis to believe that a person who scores a 483 on the examination is less qualified than a person who scores 483 (or even 425) on the first time. To impose an arbitrary limit on the number of times the examination may be taken before branding the applicant as permanently unqualified with no recourse, even though the applicant may be qualified as shown by her actual performance on the examination in another state, deprives Dr. Linton of the opportunity to pursue her chosen calling, and to get a fair return on the tremendous amount of time and money she has invested in her education, in the absence of any reasonable basis to believe that a person who passes the examination after three unsuccessful attempts is unqualified to enter her profession.

I do not mean to imply that an applicant must be allowed to take the examination an unlimited number of times, nor to say that an applicant may be deemed unqualified based on multiple failures, nor that the Board may not impose additional requirements on applicants after a certain number of unsuccessful attempts. I would merely hold that there must be some reasonable basis for believing that a particular limit would protect the public from unqualified practitioners. The arbitrary three-times-and-out limit imposed by section 340.240.6 and the Board's regulation has not been shown to have any basis in the educational theory of the National Board Examination, as Dr. Miller has testified. In this case in particular we do not need to speculate whether her three previous attempts make Dr. Linton unqualified, because she has in fact established that she is qualified. The limit imposed by the Board pursuant to the statute is based upon a supposition. But the supposition is not true, as shown by Dr. Linton's score of 483. If the judgment made by the Board pursuant to the statute is "at least debatable, the issue settles on the side of validity." *Mahoney,* 807 S.W.2d at 512–13; *See also, Casualty Reciprocal Exchange v. Missouri Employers' Mutual Insurance Company,* 956 S.W.2d 249,

257 (Mo. banc 1997). In Dr. Linton's case, the absolutist judgment is not debatable.

Protection of the public is a stated purpose of occupational and professional licensing; yet section 340.202 provides for a Board composed of five veterinarians and one public member. The statute thus entrusts to a board dominated by the profession itself the duty of protecting the public. In these circumstances, it is appropriate for courts to guard against the danger of economic protectionism by careful scrutiny of the Board's actions. *See, "Fair Treatment for the Licensed Professional: The Missouri Administrative Hearing Commission,"* 37 Mo. L.Rev. 410, 416–421 (1972). The only basis that could be seen for the Board's action pursuant to the statute is economic protectionism, that is, as Dr. Miller testified, limiting the number of qualified applicants who are licensed to practice veterinary medicine in Missouri. Arbitrary action, done for reasons of economic protection, is simply not legitimate.

The Board has the power ultimately to protect the public from unqualified practitioners, but its exclusions, whether based on statute or the Board's own judgment, must be rationally related to that objective. Since that is not the case here, I would conclude that the absolute bar imposed by the Board pursuant to the statute and regulation violates Dr. Linton's right to equal protection. I would affirm the decision of the trial court ordering the Board to grant a license to Dr. Linton.