**Margaret KELLY, State Auditor of Missouri, Respondent,**

v.

**Richard HANSON, Commissioner of Administration, et al., Appellant.**

**No. WD 55438.**

Missouri Court of Appeals, Western District.

Nov. 24, 1998.

Rehearing Denied Dec. 22, 1998.

Transfer Denied Dec. 22, 1998.

Application to Transfer Denied Jan. 7, 1999.

Jeremiah W. (Jay) Nixon, Atty. Gen., James Layton, Chief Deputy Atty. Gen., Paul Wilson, Asst. Atty. Gen., Jefferson City, for appellant.

Marc Ellinger, Legal Counsel, State Auditor's Office, Jefferson City, for respondent.

Before ULRICH, P.J., BRECKENRIDGE, C.J. and SMART, J.

ULRICH, P.J.

Richard Hanson, the Commissioner of Administration of the State of Missouri, and Mark Ward, the Director of the Division of Budget and Planning, (OA–BP) appeal the judgment of the trial court in favor of the Honorable Margaret Kelly, State Auditor of the State of Missouri, declaring that certain funds from riverboat gaming admission fees and from riverboat enforcement recoupment, which are deposited in the state treasury to

the credit of the Gaming Commission Fund and annually appropriated by the General Assembly, are included in the calculation of "total state revenues" for purposes of the Hancock Amendment. OA–BP claims that the trial court erred in including the funds in the calculation of "total state revenues" because they were revenues approved by the voters and, therefore, not subject to the revenue limitation established in the Hancock Amendment. The judgment of the trial court is affirmed in part and reversed in part.

On November 3, 1992, the voters of Missouri approved a referendum law H.B. 149 "relating to certain gaming activities." The admission fee provision of H.B. 149, section 9, authorized the Missouri Tourism Commission to assess against an excursion gambling boat an admission fee of up to $1.00 per person embarking on the excursion gambling boat with a ticket of admission. H.B. 149, § 9, 86th Gen. Assembly, 1st Reg. Sess. (Mo. 1992). Such fee was to be deposited in the state treasury to the credit of the general revenue fund. *Id.* The recoupment provision of H.B. 149, section 11, authorized the Tourism Commission to designate a representative to board an excursion boat to supervise and check the admissions. H.B. 149, § 11. Section 11 also authorized the Tourism Commission to establish a procedure by which the commission would be reimbursed by the boat for the amount of the compensation of such representative. *Id.*

In 1993, the General Assembly enacted S.B. 10 & 11 "relating to the regulation of certain gaming activities." S.B. 10 & 11, 87th Gen. Assembly, 1st Reg. Sess. (Mo. 1993). The act repealed and reenacted H.B. 149 with changes. *Id.* Among those changes, the Missouri Gaming Commission was created and replaced the Tourism Commission to regulate riverboat gambling. § 313.004, RSMo 1994. Additionally, the Gaming Commission Fund was created wherein all revenue received by the Gaming Commission shall be deposited. § 313.835, RSMo 1994.

Changes were also made to the admission fee and recoupment provisions of H.B. 149. The new admission fee provision authorized the Gaming Commission to assess against an excursion boat licensee an admission fee of $2.00 per person embarking on the gambling boat. § 313.820, RSMo 1994. The first dollar of such fee shall be deposited in the state treasury to the credit of Gaming Commission Fund. *Id.;* § 313.835, RSMo 1994. The second dollar of the admission fee "shall not be considered state funds and shall be paid to the home dock city or county." § 313.820, RSMo 1994. For fiscal year 1995, the gaming boat admission fee generated total revenues of $25,196,812, of which $12,609,794 was deposited in the state treasury to the credit of the Gaming Commission Fund. For fiscal year 1996, the fee generated $44,594,788 in revenues with $22,297,394 deposited to the credit of the Gaming Commission Fund.

The recoupment provision of H.B. 149 was also amended in S.B. 10 & 11. The new provision provided that the Gaming Commission shall determine the amount of staff necessary to protect the public on any excursion gambling boat and that the excursion gambling boat shall reimburse the commission for the full cost of such staff. § 313.824, RSMo 1994. All revenues collected under the recoupment provision shall be deposited in the state treasury to the credit of the Gaming Commission Fund. § 313.835, RSMo 1994. For fiscal year 1995, $460,735 in recoupment revenues was deposited in the Gaming Commission Fund. For fiscal year 1996, the recoupment fee generated total revenues of $6,155,157.

Following the enactment of S.B. 10 & 11, a disagreement arose between the State Auditor and OA–BP regarding the status of the admission fee and recoupment revenues for purposes of the Hancock Amendment. Specifically, the State Auditor believed that the revenues generated by the admission fee and recoupment fee provisions were to be included in the calculation of "total state revenues" (TSR) under the Hancock Amendment. OA–BP's position, on the other hand, was that the funds had received direct voter approval and, therefore, were excluded from the TSR calculation. As a result of the disagreement, the State Auditor filed the underlying action in December 1995 seeking a declaration that the total amount of the riverboat admission fee and the enforcement recoupment collect-

ed by the Department of Revenue be included in TSR under the Hancock Amendment revenue limit. The Auditor subsequently filed a motion for summary judgment on her claim. The trial court entered judgment in favor of the Auditor declaring that $1.00 of the $2.00 admission fee deposited in the state treasury to the credit of the Gaming Commission Fund is included in the calculation of TSR for purposes of the Hancock Amendment and that the $1.00 paid to the home dock city or county is not included in the TSR calculation because it is not deposited in the state treasury. The court further found that the riverboat enforcement recoupment deposited in the state treasury to the credit of the Gaming Commission Fund is also included in the TSR calculation. This appeal by OA–BP followed.

On appeal, OA–BP claims that the trial court erred in including the admission fee and the riverboat enforcement recoupment in the calculation of TSR for Hancock Amendment purposes. It argues that the revenues were approved by voters and, therefore, not subject to the revenue limitation established in the Hancock Amendment, Article X, § 18 of the Missouri Constitution.

In the 1980 general election, Missouri voters adopted the Hancock Amendment, a constitutional amendment aimed at limiting state and local government taxation and spending. Mo. Const. art. X, §§ 16–24. The purpose of the Hancock Amendment is "to rein in increases in governmental revenue and expenditures." *Missourians For Tax Justice Educ. Project v. Holden,* 959 S.W.2d 100, 102 (Mo.1997) (citation omitted). The Hancock Amendment "aspires to erect a comprehensive, constitutionally-rooted shield to protect taxpayers from government's ability to increase the tax burden above that borne by the taxpayers on November 4, 1980." *Fort Zumwalt School Dist. v. State,* 896 S.W.2d 918, 921 (Mo. banc 1995). To achieve this purpose, the constitutional amendment establishes an annual revenue limit for state government and requires the state to disgorge the excess when its annual revenues exceed the constitutional revenue ceiling. *Holden,* 959 S.W.2d at 102.

Section 18(a) of the Hancock Amendment limits the amount of taxes that may be imposed by the General Assembly on the Missouri taxpayers. Mo. Const. art. X, § 18(a). It prohibits the General Assembly from imposing "taxes of any kind which, together with all other revenues of the state, federal funds excluded, exceed the revenue limit established in [the] section." *Id.* Section 18(a) provides a formula for calculating the revenue limit which, in essence, requires that for each year, the ratio between total state revenues and the personal income of Missourians remains the same as the ratio calculated in the base years established by the Amendment. *Id.* Section 18(b) provides that in the event that total state revenues exceed the revenue limit by one percent or more, the excess revenues shall be refunded pro rata to the taxpayers. Mo. Const. art. X, § 18(b).

In determining whether the state revenue limit has been exceeded requiring a refund in any given fiscal year, "total state revenues" (TSR) must be calculated. Section 17 of the Hancock Amendment defines the term "total state revenues" to include "all general and special revenues, license and fees, excluding federal funds, as defined in the budget message of the governor for fiscal year 1980–1981." Mo. Const. art. X, § 17(1). Increases in taxes receiving voter approval, however, are excluded from "total state revenues" for the purposes of calculating the revenue limit in section 18(a). *Goode v. Bond,* 652 S.W.2d 98 (Mo. banc 1983). The issue in this case is whether the admission fee provision, section 313.820, RSMo 1994, and the riverboat enforcement recoupment provision, section 313.824, RSMo 1994, received voter-approval, thus excluding funds collected under the provisions from the calculation of TSR. More specifically, the question to be determined is whether the repeal and amendment of H.B. 149 by S.B. 10 & 11 affected the voter-approved status of the provisions.

The State Auditor contends that while Missouri voters approved H.B. 149, S.B. 10 & 11 was not presented to or approved by the voters and was, instead, a new enactment by the General Assembly for purposes of the Hancock Amendment's state revenue limit. The Auditor relies on the 1994 Missouri Su-

preme Court case, *Harris v. Missouri Gaming Comm'n,* 869 S.W.2d 58 (Mo. banc 1994), for the proposition that S.B. 10 & 11 was not a continuation of H.B. 149, but a new act. In *Harris,* the plaintiff claimed that S.B. 10 & 11 violated Article III, section 39(9) of the Missouri Constitution, which prohibits the General Assembly from authorizing lotteries or gift enterprises. *Id.* at 60. Because the constitutional prohibition does not apply to a proper constitutional amendment, the defendants argued that S.B. 10 & 11 was not a new enactment by the General Assembly but a continuation of H.B. 149. *Id.* at 61. In holding that S.B. 10 & 11 was an act of the General Assembly subject to the limitations in Article III, section 39(9), the Supreme Court referred to "significant differences" between H.B. 149 and S.B. 10 & 11. *Id.* The Court quickly dismissed the defendants' argument that the provisions at issue in the case, the definition of "gambling game," was substantially similar between H.B. 149 and S.B. 10 & 11 with a conclusory statement that S.B. 10 & 11 was a new enactment because the General Assembly "changed the wording" from that in H.B. 149. *Id.* The Court then immediately began its more lengthy discussion of the definition of lottery and its determination of what games constituted lotteries. *Id.* at 61–64.

*Harris* is not controlling in this case. It did not decide the issue of whether certain provisions in S.B. 10 & 11 remained voter-approved for purposes of calculating TSR under the Hancock Amendment. The holding in *Harris* was limited to whether S.B. 10 & 11 was an enactment of the General Assembly for purposes of Article III, section 39(9) of the Missouri Constitution. *Id.* at 61. As mentioned above, the Hancock Amendment was adopted by Missouri voters in 1980. "Reduced to its essence, the Hancock Amendment reveals the voters' basic distrust of the ability of representative government to keep its taxing and spending requirements in check." *Beatty v. Metropolitan St. Louis Sewer Dist.,* 867 S.W.2d 217, 221 (Mo. banc 1993). The voters, however, provided an exception to the revenue limits imposed on the General Assembly for *voter-approved* tax increases. *Goode,* 652 S.W.2d at 98. Thus, in analyzing whether a certain tax increase is

excluded from the state revenue limits based on voter approval, the intent of the voters is critical. *Harris* provided little guidance on this issue. Without deciding whether the voters' original intent remained intact after the amendment of H.B.149, the Court in *Harris* made the conclusory statement that the subsequent senate bill was a new act by the General Assembly for Article III, section 39(9) purposes. Because the intent of the Missouri voters is so critical in the instant case regarding the Hancock Amendment, *Harris* is not dispositive.

 In determining the effect of the legislative changes on H.B. 149 and specifically on the voter-approved status of the admission fee and enforcement recoupment provisions, an analysis of general rules of statutory construction is necessary. The legislature has provided instruction on how re-enactments are to be construed in section 1.120, RSMo 1994. Section 1.120 provides, "The provisions of any law or statute which is reenacted, amended or revised, so far as they are the same as those of a prior law, shall be construed as a continuation of such law and not as a new enactment." § 1.120, RSMo 1994. This statute is consistent with the general rule that when part of a statute is repealed by an amendatory act, the provisions retained are regarded as a continuation of the former law while those omitted are treated as repealed. *State ex rel. Klein v. Hughes,* 351 Mo. 651, 173 S.W.2d 877, 880 (1943). This rule of statutory construction was further explained in *Citizens Bank & Trust Co. v. Director of Revenue,* 639 S.W.2d 833 (Mo.1982):

> [W]here a statute is amended only in part, or as respects only certain isolated and integral sections thereof and the remaining sections or parts of the statute are allowed and left to stand unamended, unchanged, and apparently unaffected by the amendatory act or acts, it is presumed that the Legislature intended the unamended and unchanged sections or parts of the original statute to remain operative and effective, as before the enactment of the amendatory act.

*Id.* at 835 (quoting *State ex rel. Dean v. Daues*, 321 Mo. 1126, 14 S.W.2d 990, 1002 (1928)). The whole statute as amended, however, should be construed on the presumption that the legislature intended to accomplish something by the amendment. *Wollard v. City of Kansas City*, 831 S.W.2d 200, 203 (Mo. banc 1992).

██ In 1993, the General Assembly enacted S.B. 10 & 11, which amended the 1992 referendum law H.B. 149 approved by Missouri voters. In the enacting clause of S.B. 10 & 11, the legislature explained that it was repealing certain sections of H.B. 149, including sections 9 and 11 at issue here, and enacting in lieu thereof new sections relating to the same subject. Such action by the General Assembly constituted a reenactment of the referendum law, and the question in this case becomes whether the amended sections 9 and 11 are the same as the prior law and, thus, a continuation of such voter-approved law.

The admission fee provision of H.B. 149, section 9, provided in pertinent part:

> An excursion boat licensee shall pay to the commission an admission fee for each person embarking on an excursion gambling boat with a ticket of admission. The admission fee, not exceeding one dollar, shall be set by the commission.

H.B. 149, § 9. Such fee was to be deposited into the state treasury to the credit of the general revenue fund. *Id.* The admission fee provision as amended in S.B. 10 & 11 provided in pertinent part:

> An excursion boat licensee shall pay to the commission an admission fee of two dollars for each person embarking on an excursion gambling boat with a ticket of admission, and one dollar of such fee shall not be considered state funds and shall be paid to the home dock city or county.

§ 313.820, RSMo 1994. The other dollar of the admission fee shall be deposited in the state treasury to the credit of the Gaming Commission Fund. *Id.;* § 313.835, RSMo 1994. The General Assembly increased the admission fee payable by an excursion boat

licensee from a maximum of $1.00 per person to $2.00 per person. In doing so, however, it clearly distinguished between the original maximum authorized $1.00 fee approved by the voters and payable to the state's general revenue fund, and the new $1.00 fee, which "shall not be considered state funds and shall be paid to the home dock city or county."

██ Additionally, although the original voter-authorized $1.00 fee is now to be deposited into the state treasury to the credit of different funds-the Gaming Commission Fund rather than the general revenue fund-state expenditure of the collected fee requires annual appropriation by the General Assembly. In passing the referendum, Missouri voters approved the deposit of the admission fee into the state treasury to the credit of the general revenue fund. Article III, section 36, of the Missouri Constitution grants authority to the General Assembly to divert by lawful appropriation as it determines money received by the state and deposited in the treasury. Mo. CONST. art. III, § 36. When voters by referendum direct that a certain revenue is to be deposited into the general revenue fund rather than a specific fund for a specific purpose, the voters give the legislature discretion on how the revenue will be spent. In S.B. 10 & 11, the General Assembly directed that the admission fee be deposited into the state treasury to the credit of the Gaming Commission Fund, a specific fund, not the general revenue fund. By amending the provision, the General Assembly merely designated a specific allocation for the revenue pursuant to the discretion given to it by the Missouri voters when they directed the fee authorized by H.B. 149 be paid into the general revenue fund. The practical effect is the same as if the General Assembly had legislated the fee authorized by H.B. 149 and paid into the general revenue fund be credited to the Gaming Commission Fund and appropriated for expenditure. Such allocation by the General Assembly was not inconsistent with the intent of the voters.[1]

The original maximum $1.00 fee previously approved by the voters in H.B. 149 was,

---

1. If, however, the voters had approved a referendum directing revenues collected pursuant to the admission fee provision to be credited to a specif-

ic fund to be used for a specific purpose, and the General Assembly amended that provision to direct the revenues to a different fund or to the

therefore, retained substantially unchanged by the General Assembly when it amended the referendum law. The intent of the voters that an excursion boat licensee pay not more than $1.00 per person embarking on a riverboat to the state remained intact. The portion of section 313.820, RSMo 1994, relating to the admission fee payable to the state was, therefore, a continuation of the referendum law. As such, the $1.00 admission fee payable to the state is voter-approved and not included in the calculation of "total state revenues" for purposes of the Hancock Amendment revenue limit.

■ The recoupment provision of H.B. 149, on the other hand, was substantially amended by S.B. 10 & 11 and, thus, did not retain its voter-approved status. Section 11 of H.B. 149 provided in pertinent part:

> The commission may designate a representative to board a licensed excursion gambling boat, who shall have full access to all places within the enclosure of the boat and who shall supervise and check the admissions. The compensation of the representative shall be fixed and paid by the commission. The commission shall establish a procedure by which the commission shall be reimbursed for the amount of the compensation of such representatives by licensed gambling excursion boat operators.

H.B. 149, § 11. The enforcement recoupment provision as amended by S.B. 10 & 11 provided in pertinent part:

> The commission shall establish by rules and regulations the amount of staff necessary to protect the public on any excursion gambling boat. The excursion gambling boat licensee shall reimburse the commission for the full cost of such staff.

§ 313.824, RSMo 1994. The General Assembly significantly amended the enforcement recoupment provision of H.B. 149 in S.B. 10 & 11. The purpose of the provision was changed from providing reimbursement to the commission for a representative to check admissions to providing reimbursement to the commission for a staff to protect the public. The amount of the reimbursement was also increased from covering the cost of "a representative" to covering the cost of a

general revenue fund, the intent of the voters

"staff." To construe the amended recoupment provision to be a continuation of the provision in the voter-approved referendum would be unreasonable. The intent of the voters of Missouri to require a riverboat licensee to reimburse the commission for the cost of a representative to check admissions was not preserved in section 313.824, RSMo 1994, which requires reimbursement for a staff to protect the public. The recoupment provision of the referendum was, therefore, repealed, and section 313.824, RSMo 1994, was a new enactment by the General Assembly. As such, the funds generated by the new recoupment provision are included in the calculation of "total state revenues" for purposes of the Hancock Amendment.

The judgment of the trial court declaring that funds generated from the admission fee provision are included in the calculation of TSR for Hancock Amendment purposes is reversed. The judgment of the trial court declaring that funds generated by the enforcement recoupment provision are included in the calculation of TSR is affirmed.

All concur.

would have been distorted.