Eddie THOMPSON, Appellant,

v.

ICI AMERICAN HOLDING f/k/a National Starch & Chemical, Respondent.

No. WD 72374.

Missouri Court of Appeals, Western District.

Aug. 9, 2011.

As Modified Aug. 30, 2011.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 30, 2011.

Application for Transfer Denied Oct. 4, 2011.

---

Wilson R. Stafford, Kansas City, MO, for appellant.

Douglas M. Greenwald, Kansas City, KS, for respondent.

Before: MARK D. PFEIFFER, P.J., and THOMAS H. NEWTON and ALOK AHUJA, JJ.

ALOK AHUJA, Judge.

Eddie Thompson was injured in October 2007 while working for National Starch and Chemical Company, now known as ICI American Holding Company. Thompson filed a workers' compensation claim concerning his injuries. He now appeals the Labor and Industrial Commission's Final Award Allowing Compensation, which awarded Thompson compensation for a permanent partial disability, but reduced his award by 37.5% pursuant to § 287.120.5,[1] based on the Commission's determination that Thompson's injury was caused by his failure to obey a National Starch safety rule. While we agree with Thompson that the Commission made a $300.00 arithmetical error in calculating his award after the 37.5% reduction, we reject his challenges to the reduction itself, and therefore affirm the Commission's Final Award as modified.

## Factual Background

Thompson had worked at National Starch as a mechanic for over thirty years when he was injured on October 20, 2007. Thompson was injured when he and another employee attempted to replace three broken drive belts on a "blending blower" at National Starch's North Kansas City plant. Thompson suffered injuries to three fingers on his right hand when they were pinched between a drive belt and a pulley. Thompson and his co-worker had cut the electrical power to the blower prior to beginning work on the broken belts. They failed, however, to eliminate the reverse air flow to the blower. As a result, a sheave[2] continued to rotate. Thompson testified that, although he had replaced blower belts before, he had never confronted a sheave that continued to rotate after electrical power to the blower was cut off; the fact that the sheave continued to move was unusual. Instead of shutting off the air valve to the blower or seeking help from a supervisor, Thompson and his co-worker inserted an aluminum broom handle into the machine to stop the sheave from rotating. The broom handle broke shortly after Thompson began working on the blower, resulting in his injury.

National Starch argued that Thompson caused his own injury by failing to follow its Lock–Out–Tag–Out safety rules. As a general matter, the Lock–Out Rules require that workers completely de-energize and isolate a piece of equipment from energy sources before any maintenance or repair work is conducted on the equipment, and physically block the equipment from being inadvertently set in motion ("lock out"); the rules also require that tags or placards be placed at the lock-out points, indicating who initiated the lock out, and when, and establishing the person or persons authorized to re-energize the equipment ("tag out").

An administrative law judge held a hearing on Thompson's workers' compensation claim in March 2009. The ALJ awarded Thompson $72,834.39 for temporary total disability, permanent partial disability, and medical costs. The ALJ also assessed a 37.5% reduction to Thompson's award pursuant to § 287.120.5, however, based on his finding that Thompson's injury was caused by his failure to follow National Starch's Lock–Out Rules. Thompson's award was also subject to subject to a $25,364.66 cred-

1. Unless otherwise indicated, statutory references are to the RSMo 2000 as updated through the 2010 Cumulative Supplement.

2. A "sheave" is "the grooved wheel or pulley of a pulley block or any of several such wheels." WEBSTER'S THIRD NEW INT'L DICTIONARY 2090 (unabridged ed.1993).

it for benefits National Starch had previously paid. According to the ALJ, this resulted in total benefits due to Thompson of $19,856.84. Thompson appealed the ALJ's decision to the Commission. The Commission affirmed and adopted the ALJ's award, findings of fact, and conclusions of law. This appeal follows.

## Standard of Review

 Our review of the Commission's Final Award is governed by § 287.495.1, which provides:

> The court, on appeal, shall review only questions of law and may modify, reverse, remand for rehearing, or set aside the award upon any of the following grounds and no other:
>
> (1) That the commission acted without or in excess of its powers;
>
> (2) That the award was procured by fraud;
>
> (3) That the facts found by the commission do not support the award;
>
> (4) That there was not sufficient competent evidence in the record to warrant the making of the award.

"In reviewing a decision of the Commission, we examine the whole record to determine if it contains sufficient competent and substantial evidence to support the award, that is, whether the award is contrary to the overwhelming weight of the evidence." *Lawrence v. Anheuser Busch Cos.*, 310 S.W.3d 248, 250 (Mo.App. E.D. 2010). "[W]e review the findings of the Commission and not those of the ALJ." *Id.* "When, as here, the Commission affirms or adopts the findings of the ALJ, we review the decision and findings of the ALJ as adopted by the Commission." *Id.* In con-

ducting our review, "[w]e defer to the Commission on issues concerning credibility and weight to be given conflicting evidence." *Bailey v. Phelps Cnty. Reg'l Med. Ctr.*, 328 S.W.3d 770, 773 (Mo.App. S.D. 2010). We review questions of law *de novo. Difatta–Wheaton v. Dolphin Capital Corp.*, 271 S.W.3d 594, 595 (Mo. banc 2008); *Noah v. Lindbergh Inv., LLC*, 320 S.W.3d 212, 215 (Mo.App. E.D.2010).

## Analysis

Missouri's Workers' Compensation Law provides that,

> [w]here the injury is caused by the failure of the employee to use safety devices where provided by the employer, or from the employee's failure to obey any reasonable rule adopted by the employer for the safety of employees, the compensation and death benefit provided for herein shall be reduced at least twenty-five but not more than fifty percent; provided, that it is shown that the employee had actual knowledge of the rule so adopted by the employer; and provided, further, that the employer had, prior to the injury, made a reasonable effort to cause his or her employees to use the safety device or devices and to obey or follow the rule so adopted for the safety of the employees.

§ 287.120.5.[3] "The burden of establishing any affirmative defense is on the employer.... In asserting any claim or defense based on a factual proposition, the party asserting such claim or defense must establish that such proposition is more likely to be true than not true." § 287.808.

---

**3.** We note that, of the benefits awarded to Thompson prior to the 37.5% reduction, $13,991.90 represented the cost of his medical treatment. The Commission applied the 37.5% reduction to these medical costs, as well as to the other elements of Thompson's award. Neither party has addressed whether such medical costs constitute "compensation" subject to reduction under § 287.120.5, and we accordingly have no occasion to decide the issue.

## I.

Thompson first challenges the Commission's conclusion that his failure to obey the Lock–Out Rules caused his injury. Thompson asserts, instead, that replacing the drive belt at full tension caused the accident. We disagree.

The determination of the cause of an injury is a factual determination, on which we defer to the Commission if competent and substantial evidence supports its conclusions. *Leake v. City of Fulton*, 316 S.W.3d 528, 532 n. 3 (Mo.App. W.D. 2010). The ALJ explained his finding that Thompson's failure to follow the Lock–Out Rules caused his injury as follows:

> Claimant was injured when his right hand was drawn between a moving pulley and a belt. I find that Claimant was injured because he did not shut off the energy to the blower motor before beginning the belt replacement work. He did not isolate and de-energize the equipment. If he had, the accident would not have occurred. Claimant testified when he was attempting to put on the belt the machine suddenly moved. Mr. Duran[, National Starch's Security Safety Health and Environmental Manager,] testified that the accident was caused by Claimant not locking out of the electrical source and not locking out the air that turned the pulley.

Under § 287.120.5, "there must be a causal connection between the violation of the employer's safety rule and the employee's injury." *Swillum v. Empire Gas Transp., Inc.*, 698 S.W.2d 921, 929 (Mo.App. S.D.1985); *see also Akers v. Warson Garden Apts.*, 961 S.W.2d 50, 53 (Mo.1998) (applying § 287.120.4). Here, sufficient competent and substantial evidence supports the Commission's conclusion that Thompson's injury was caused by his failure to fully isolate and de-energize the blower, in violation of National Starch's Lock–Out Rules.

National Starch's Lock–Out Rules explicitly require that "*[a]ll* energy isolating devices that are needed to control the energy to the machine or equipment shall be physically located and operated in such a manner as to isolate the machine or equipment from the energy source(s)," and that "*[a]ll* potentially hazardous stored or residual energy shall be relieved, disconnected, restrained, and otherwise rendered safe." The stated purpose of the Lock–Out Rules is to "prevent the unexpected or accidental startup of machinery or equipment or release of stored energy which could cause injury to employees"—precisely the situation which occurred here.

Thompson himself testified that when the broom handle broke, the sheave suddenly began to move due to the reverse air flow operating upon it, pulling his hand into the pulley, which resulted in his injuries.

Q. Your gloved hand was drawn into the pulley by the drive belt, when it started to be moved by what's been described ... [as] back flow air out of that bin, is that right?

A. Yeah.

Q. So your hand was pulled into this pulley by the drive belt and your fingers were, in essence, pinched and cut by the contact between the drive belt and pulley, true?

A. True.

Similarly, National Starch's accident report found that Thompson's failure to eliminate air flow to the blower led to the injury. The report concluded that "no lockouts were used by either employee to eliminate the air flow to the blower" (a secondary energy source as reflected by the fact that the sheave continued to rotate after electrical energy was cut), and instead "the employees placed a rubber coated aluminum broom handle against the sheave of the blower in an attempt to stop

the rotation of the blower." The report explains that "[w]hen attempting to install the second belt the employees lost control of the blower and it began to rotate ... [and] the employee's right hand followed the travel of the belt and was caught between the belt and blower sheave as it rotated clockwise." Further, Richard Duran, the safety manager at National Starch, testified that the accident resulted from Thompson's failure to lock out and de-energize the primary and secondary energy sources of the blower, as well as his failure to adjust the belt assembly to eliminate the tension in the belts as they were being replaced.

In light of this evidence, it was reasonable for the Commission to conclude that the failure to lock out all energy sources to the blower caused Thompson's injury, because the injury occurred when his right hand was drawn between a moving pulley and a belt, and the pulley was moving due to Thompson's failure to follow the Lock-Out Rules.

■ Thompson argues that the installation of a replacement drive belt at full tension was the principal cause for the accident. However, even if his failure to adjust the pulley mechanism to reduce the tension in the belt was a concurrent cause of his injuries, in order to constitute the proximate cause of an injury a particular act or omission " 'need not be the sole cause of the injury, as long as it is one of the efficient causes thereof, without which injury would not have resulted.' " *Hensley v. Jackson County,* 227 S.W.3d 491, 496 (Mo. banc 2007) (quoting *Oldaker v. Peters,* 869 S.W.2d 94, 100 (Mo.App. W.D.

1993)).[4] Because the Commission's finding that Thompson's failure to follow the Lock-Out Rules bore a causal connection to his injuries is supported by competent and substantial evidence, we have no basis to disturb it, despite evidence of another condition which may also have contributed to his injury.

## II.

■ Thompson contends in his second Point that the Commission erred in reducing his award because National Starch failed to demonstrate that he knew that the Lock-Out Rules applied to eliminating reverse air flow in the circumstances he faced on October 20, 2007. We disagree.

The Commission's Final Award expressly states that it did not believe Thompson's testimony that he did not knowingly violate a safety rule. Thompson acknowledged that he had received training several times on the Lock-Out Rules, and that those rules had not changed materially in at least the past twenty years. National Starch's records confirm that Thompson received Lock-Out Rules training on ten separate occasions between 1995 and 2007. In September 2007, only one month before his injury, Thompson successfully completed a multiple-choice test on the Lock-Out Rules after receiving training on them. He correctly answered that the Lock-Out Rules apply whenever an employee "needs to place a part of their body in or on a machine where work is being performed," that the rules require "shutting down equipment, isolating energy, and blocking [and] securing machinery," and that in order to correctly lock out and tag out the

---

4. *See also, e.g., Sundermeyer v. SSM Reg'l Health Servs.,* 271 S.W.3d 552 (Mo. banc 2008):

> The general rule is that if a defendant is negligent and his [or her] negligence combines with that of another, or with any other independent, intervening cause, he [or she] is liable, although his [or her] negli-

gence was not the sole negligence or the sole proximate cause, and although his [or her] negligence, without such other independent, intervening cause, would not have produced the injury.

*Id.* at 554–55 (quoting *Harvey v. Washington,* 95 S.W.3d 93, 96 (Mo. banc 2003)).

equipment one "must shutdown equipment, isolate energy and lock out and tag out source, [and] relieve stored energy and test and verify equipment."

The evidence before the Commission also supports the finding that Thompson was aware that the Lock–Out Rules applied to the reverse air flow energy which continued to move the blending blower's sheave after electrical energy had been shut off, and that his testimony that he did not knowingly violate the rules was not credible. As noted above, the Lock–Out Rules require that "*[a]ll* potentially hazardous stored or residual energy shall be relieved, disconnected, restrained, and otherwise rendered safe." In this case, the fact that the reverse air flow constituted a significant—and potentially dangerous—energy source was made evident to Thompson by the fact that it continued to power the sheave even after electrical power to the blower was isolated, a circumstance which Thompson testified was unusual and which he had never experienced before. Thompson acknowledged during cross-examination that air flow was a type of energy in use at the National Starch plant, and that, besides locking out electrical energy, valves controlling air or water could be locked out using chains. His co-worker Ronald Walker testified that the fact that the sheave was rotating in the opposite direction from the way it normally moved when fully energized indicated that the sheave was being powered by reverse air flow coming from a blend bin vent fan. Walker understood that valves could control air and water flow at the plant, and testified that he looked for a hand valve on the blending blower before Thompson's injury, but failed to see one. In addition, Steven Willits, the maintenance planning scheduler at the plant, testified that the Lock–Out Rules required the elimination of all types of energy to a piece of equipment, not just sources of electrical energy, and that the types of energy subject to the rules included "pneumatic, which would be air flow through a system." Willits testified that, under the Lock–Out Rules "you have to isolate that air flow; either by shutting valves or disconnecting lines," and that he expected maintenance personnel to be familiar with the valves necessary to accomplish this isolation.

Accordingly, substantial evidence supports the Commission's finding that Thompson was aware that the Lock–Out Rules applied to reverse air flow, because it is energy requiring isolation and elimination before maintenance. Although Thompson stated that he did not know the location of the valves that would have eliminated the reverse air flow, the Lock–Out Rules apprised him of his responsibility to completely de-energize the equipment before beginning maintenance. Further, Willits testified that National Starch's policy was that, if an employee cannot determine how to lock out a particular energy source, that employee should contact a supervisor before proceeding with any particular maintenance or repair. As such, the evidence supports the Commission's finding that Thompson's inability to locate the back flow shut off valves did not relieve him of his responsibility to comply with Lock–Out Rules.

### III.

Thompson's third Point argues that the Commission erroneously concluded that National Starch made a reasonable effort to compel employee compliance with the Lock–Out Rules.

■ Section 287.120.5 requires that the employer demonstrate that it had, "prior to the injury, made a reasonable effort to cause [its] employees . . . to obey or follow the rule[s] so adopted for the safety of the employees." In finding that National Starch satisfied this element of the affirmative defense, the Commission found:

The evidence demonstrates that Employer trained its employees, including Claimant, on several occasions about its lock out/tag out rules. Exhibit 3 includes training materials Employer used in training its employees. These materials, as well as the testimony of the witnesses, prove that Employer had made an effort to cause its employees to obey and follow the rules so adopted. I find the training was reasonable. I find the training provided to Employer's employees demonstrated a reasonable effort to cause its employees to obey and follow the rules so adopted.

■ Sufficient competent and substantial evidence supports the Commission's conclusion on this point. Thompson contends that there is no evidence of National Starch enforcing the Lock–Out Rules against violators of those rules prior to his accident, and that, by its very nature, prior safety-rule *instruction* does not constitute prior safety-rule *enforcement*. We disagree. The statute does not require evidence that an employer enforced its safety rules by imposing discipline upon employees who violated the rules. Instead, the statute requires that the Employer make "reasonable effort[s] to cause [its] employees ... to obey or follow the rule[s]."[5] An employer's efforts to train and monitor employee compliance with a safety regulation is relevant to whether the employer took reasonable steps to cause employee compliance. The Commission is not required to conclude that an employer failed to make reasonable efforts to cause its employees to obey or follow safety regulations simply because the record lacks evidence of previous safety violations and consequent discipline. If the employer was prevented from satisfying this requirement of § 287.120.5 without evidence of past employee misconduct and discipline, an employer with a perfect record of employee compliance with safety rules prior to an injury would be foreclosed from asserting the defense.

Here, substantial evidence in the record supports the Commission's determination that National Starch made reasonable efforts to cause employee compliance with its Lock–Out Rules. National Starch distributed written safety materials and conducted regular training seminars educating employees concerning the rules, and warning them that "[d]isciplinary action will be taken if employees fail to follow necessary guidelines ... up to and including termination." Training records revealed that Thompson received almost annual training on these rules between March 1995 and September 2007, and successfully completed a written test to confirm his understanding of those rules. This evidence supports the Commission's conclusion that National Starch's Lock–Out Rules were not simply "on the books," and "dusted off" for purposes of these proceedings, as Thompson contends—employees were actively and repeatedly trained on these rules, their comprehension of the rules was confirmed by written tests, and they were warned of discipline up to and including termination if they failed to comply. The Commission did not err in concluding that National Starch engaged in "a reasonable effort to cause [its] employees ... to obey or follow the rule[s]," as § 287.120.5 requires.

### IV.

■ Thompson next argues that the provision in § 287.120.5 reducing an em-

---

5. We note that, prior to a 2005 amendment, the statute required that "the employer had ... made a *diligent* effort to cause employees ... to obey or follow" relevant safety rules, § 287.120.5 RSMo 2000 (emphasis added), as opposed to the *"reasonable* effort" required by the current law.

ployee's workers' compensation award violates his equal protection rights under the Missouri Constitution.

▉▉▉ "Pursuant to article V, section 3 of the Missouri Constitution, the Missouri Supreme Court has exclusive jurisdiction in cases involving the validity of a statute." *White v. White*, 293 S.W.3d 1, 24 (Mo.App. W.D.2009) (quoting *Ahern v. P & H, LLC*, 254 S.W.3d 129, 134 (Mo.App. E.D.2008)). "However, a party's mere assertion of unconstitutionality does not deprive this Court of jurisdiction." *Id.* "When a party's claim is not real and substantial, but, instead, merely colorable, our review is proper." *Id.* "In determining whether a constitutional claim is real and substantial or merely colorable, this Court makes a preliminary inquiry as to whether it presents a contested matter of right that involves fair doubt and reasonable room for disagreement." *Id.* (citing *Mo. Highway & Transp. Comm'n v. Merritt*, 204 S.W.3d 278, 285 (Mo.App. E.D. 2006)). "If this initial inquiry shows that the claim is so legally or factually insubstantial as to be plainly without merit, the claim may be deemed merely colorable." *Id.* Here, although the specific constitutional claim Thompson raises has not previously been addressed by Missouri courts, for the reasons which follow we conclude that it does not involve "fair doubt" or "reasonable room for disagreement," and thus, that his constitutional claim is merely colorable. We accordingly have jurisdiction to decide it.[6]

Sections 287.120.4 and .5 makes both employers and employees subject to an increase or decrease of an award for misconduct resulting in an employee's injury.

Section 287.120.4 provides that "[w]here the injury is caused by the failure of the employer to comply with any statute in this state or any lawful order of the division or the commission, the compensation and death benefit provided for under this chapter shall be increased fifteen percent." Until 2005, § 287.120.5 provided for a corresponding fifteen percent reduction in "the compensation and death benefits provided for herein" where the "injury is caused by . . . the employee's failure to obey any reasonable rule adopted by the employer for the safety of employees." But, in 2005, the General Assembly amended § 287.120.5, which now mandates that the employee's award "be reduced at least twenty-five but not more than fifty percent," creating a disparity between the assessments which may be levied against employers and employees.

Thompson argues that the disparity between the twenty-five to fifty percent reduction applicable to employees under § 287.120.5, compared to the fifteen percent increase applicable to employers under § 287.120.4, is not rationally related to any legitimate state interest, and that this irrational and disparate treatment renders § 287.120.5 unconstitutional.

▉▉▉ Article I, Section 2 of the Missouri Constitution states "[t]hat all persons are created equal and are entitled to equal rights and opportunity under the law." "In deciding whether a statute violates the Equal Protection clause, this Court engages in a two-part analysis." *Etling v. Westport Heating & Cooling Servs., Inc.*, 92 S.W.3d 771, 774 (Mo. banc 2003) (footnote omitted). "The first step is to deter-

---

6. National Starch also argues that Thompson failed to preserve the issue by not raising it before the Commission. However, "[s]ince an administrative hearing commission is not empowered to determine the constitutionality of statutes, a party is not required to raise

those issues at that level." *Tadrus v. Missouri Bd. of Pharmacy*, 849 S.W.2d 222, 225 (Mo. App. W.D.1993) (citing *Duncan v. Missouri Bd. of Architects, Prof'l Eng'rs & Land Surveyors*, 744 S.W.2d 524, 531 (Mo.App. E.D. 1988)).

mine whether the classification operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *Id.* (internal quotation marks omitted). "If so, the classification is subject to strict scrutiny and this Court must determine whether it is necessary to accomplish a compelling state interest." *Id.* "If not, review is limited to determining whether the classification is rationally related to a legitimate state interest." *Id.*

Thompson concedes that this case involves neither a suspect class nor a fundamental right, and that rational basis review is accordingly appropriate. "Under th[e] [rational-basis] standard, a court will strike down the challenged legislation only if the classification 'rests on grounds wholly irrelevant to the achievement of the state's objective.'" *Id.* (quoting *Riche v. Dir. of Revenue*, 987 S.W.2d 331, 337 (Mo. banc 1999)). "Under this analysis a classification is constitutional if any state of facts can be reasonably conceived that would justify it." *Missourians for Tax Justice Educ. Project v. Holden*, 959 S.W.2d 100, 104 (Mo. banc 1998) (citing *McGowan v. Maryland*, 366 U.S. 420, 426, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)). "[U]nder a rational basis test, the Court does not have to determine whether the legislature 'should have' done something different or whether there is a better means to accomplish the same goal, and certainly not whether the chosen means is the best method." *Linton v. Missouri Veterinary Med. Bd.*, 988 S.W.2d 513, 516 (Mo. banc 1999).

Both §§ 287.120.4 and 287.120.5 are rationally designed to further the government's legitimate interest in promoting workplace safety. Prior cases have recognized that, as a general proposition, the purpose of § 287.120.4 "is to encourage *employers* to comply with the laws governing safety," by imposing a financial penalty where an employer's noncompliance causes a compensable injury. *Pavia v. Smitty's Supermarket*, 118 S.W.3d 228, 244 (Mo. App. S.D.2003) (emphasis added). Likewise, the general aim of § 298.120.5 is to give *employees* an incentive to comply with the employer's safety regulations, by shifting to employees a portion of the costs associated with their noncompliance (the provision may also, at least indirectly, provide an incentive to employers to promulgate, train employees on, and enforce safety rules designed to prevent workplace injuries).

Thompson's real complaint is not that the sections are irrational when considered separately, but that they are irrational when considered *together*. According to Thompson, §§ 287.120.4 and 287.120.5 regulate similarly situated entities, yet impose different, and unfairly unequal, monetary assessments on employers and employees. We disagree. The penalty imposed on employers § 287.120.4 is assessed only *after* the employer has already been held liable to fully compensate the employee for a work-related injury in an amount that the legislature has deemed adequate. The assessment operates not so much to compensate the injured party as to discourage the employer from similar future injury-causing conduct. Conversely, the reduction imposed by § 287.120.5 is designed to shift some, but not more than half, of the financial cost of an injury onto the claimant in specified circumstances. Unlike an employer subject to a § 287.120.4 surcharge, prior to the § 287.120.5 reduction the claimant has not been held responsible for *any* share of the costs associated with his injury. Thus, we conclude that employers and employees are not similarly situated at the time §§ 287.120.4 and .5 are applied. In these circumstances, it was not irrational for the

legislature to have decided to penalize employers at a lower rate. We therefore reject Thompson's argument that his equal protection rights are violated by the disparate treatment of employers and employees in § 287.120.4 and .5.

## V.

Thompson asserts in Point V that the Commission incorrectly calculated the amount he was owed after the 37.5% reduction. We agree.

 National Starch argues that Thompson waived this claim because he failed to raise the issue before the Commission. The record reveals, however, that Thompson identified the ALJ's mathematical error in his opening brief and oral argument to the Commission, and in a motion to correct the award after the Commission rendered its decision. The claim was preserved for review.

As part of its award, the Commission awarded Thompson $19,841.23 in temporary total disability benefits. It then assessed the 37.5% reduction pursuant to § 287.120.5, and reduced those benefits by $7,740.46 (as well as by $11,372.76 for the total temporary disability benefits National Starch had previously paid). However, the Commission miscalculated the proper reduction by $300.00: $7,440.46, not $7,7 40.46, is 37.5% of $19,841.23. Due to this miscalculation, the Commission erroneously found that Thompson was due total unpaid benefits of $19,856.84, when the correct amount is $20,156.84. Pursuant to § 287.495.1, we accordingly modify the Commission's final award to specify that Thompson is entitled to a net amount of $1,028.01 in total temporary disability benefits, resulting in a total of unpaid benefits due to Thompson of $20,156.84.

## Conclusion

The Commission's Final Award Allowing Compensation is affirmed as modified.

All concur.